## NATIONAL LABOR RELATIONS BOARD v. HEARST PUBLICATIONS, INC.

NO. 336.

Argued February 8, 9, 1944.—Decided April 24, 1944.

---

112

*Mr. Alvin J. Rockwell,* with whom *Solicitor General Fahy,, Messrs. Robert L. Stern* and *Frank Donner,* and *Miss Ruth Weyand* were on the brief, for petitioner.

*Mr. John M. Hall,* with whom *Mr. Oscar Lawler* was on the brief; *Mr. Lewis B. Binford,* with whom *Mr. Thomas S. Tobin* was on the brief; *Mr. Edward L. Compton,* with whom *Mr. H. S. Mac Kay, Jr.,* was on the brief; and *Mr. T. B. Cosgrove,* with whom *Mr. John N. Cramer* was on the brief,—for respondents in Nos. 336, 337, 338, and 339, respectively.

*Mr. Arthur W. A. Cowan* filed a brief on behalf of the International Printing Pressmen & Assistants' Union, as *amicus curiae,* in support of petitioner.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

These cases arise from the refusal of respondents, publishers of four Los Angeles daily newspapers, to bargain collectively with a union representing newsboys who distribute their papers on the streets of that city. Respondents' contention that they were not required to bargain because the newsboys are not their "employees" within the meaning of that term in the National Labor Relations Act, 49 Stat. 450, 29 U. S. C. § 152,[1] presents the important question which we granted certiorari[2] to resolve.

---

[1] Section 2 (3) of the Act provides that "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless the Act explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual

114

The proceedings before the National Labor Relations Board were begun with the filing of four petitions for investigation and certification [3] by Los Angeles Newsboys Local Industrial Union No. 75. Hearings were held in a consolidated proceeding [4] after which the Board made findings of fact and concluded that the regular full-time newsboys selling each paper were employees within the Act and that questions affecting commerce concerning the representation of employees had arisen. It designated appropriate units and ordered elections. 28 N. L. R. B. 1006.[5] At these the union was selected as their representative by majorities of the eligible newsboys. After the union was appropriately certified, 33 N. L. R. B. 941, 36 N. L. R. B. 285, the respondents refused to bargain with it. Thereupon proceedings under § 10, 49 Stat. 453-455, 29 U. S. C. § 160, were instituted, a hearing [6] was held and respondents were found to have violated §§ 8 (1) and 8 (5) of the Act, 49 Stat. 452-453, 29 U. S. C. § 158 (1), (5). They were ordered to cease and desist from such violations and to bargain collectively with the union upon request. 39 N. L. R. B. 1245, 1256.

Upon respondents' petitions for review and the Board's petitions for enforcement, the Circuit Court of Appeals, one judge dissenting, set aside the Board's orders. Re-

---

employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse."

[2] 320 U. S. 728.

[3] Pursuant to § 9 (b) and (c) of the Act; 49 Stat. 453, 29 U. S. C. § 159 (b) and (c).

[4] Although it treated the four representation petitions in one consolidated proceeding and disposed of them in one opinion, the Board did not consider evidence with respect to one publisher as applicable to any of the others.

[5] Subsequently those orders were amended in various details. 29 N. L. R. B. 94, 95; 30 N. L. R. B. 696, 697; 31 N. L. R. B. 697.

[6] The record in the representation proceeding was in effect incorporated in the complaint proceeding.

jecting the Board's analysis, the court independently examined the question whether the newsboys are employees within the Act, decided that the statute imports common-law standards to determine that question, and held the newsboys are not employees. 136 F. 2d 608.

The findings of the Board disclose that the Los Angeles Times and the Los Angeles Examiner, published daily and Sunday,[7] are morning papers. Each publishes several editions which are distributed on the streets during the evening before their dateline, between about 6:00 or 6:30 p. m. and 1:00 a. m., and other editions distributed during the following morning until about 10:00 o'clock. The Los Angeles Evening Herald and Express, published every day but Sunday, is an evening paper, which has six editions on the presses between 9:00 a. m. and 5:30 p. m.[8] The News, also published every day but Sunday, is a twenty-four hour paper with ten editions.[9]

The papers are distributed to the ultimate consumer through a variety of channels, including independent dealers and newsstands often attached to drug, grocery or confectionery stores, carriers who make home deliveries, and newsboys who sell on the streets of the city and its suburbs. Only the last of these are involved in this case.

The newsboys work under varying terms and conditions. They may be "bootjackers," selling to the general public at places other than established corners, or they may sell

---

[7] The Times' daily circulation is about 220,000 and its Sunday circulation is about 368,000. The Examiner's daily circulation is about 214,000 and its Sunday circulation is about 566,000.

[8] The Herald has a circulation of about 243,000. Both it and the Examiner are owned by Hearst Publications, Inc.

[9] The News has a circulation of about 195,000. Its first three and seventh editions are consigned for the most part to route delivery or suburban dealers. Its fourth edition, which goes to press at 2:45 a. m., is sold in the city during the mornings. The remaining editions, which go to press at regular intervals between 9:50 a. m. and 5:00 p. m., are sold in the city during the afternoons.

at fixed "spots." They may sell only casually or part-time, or full-time; and they may be employed regularly and continuously or only temporarily. The units which the Board determined to be appropriate are composed of those who sell full-time at established spots. Those vendors, misnamed boys, are generally mature men, dependent upon the proceeds of their sales for their sustenance, and frequently supporters of families. Working thus as news vendors on a regular basis, often for a number of years, they form a stable group with relatively little turnover, in contrast to schoolboys and others who sell as bootjackers, temporary and casual distributors.

Over-all circulation and distribution of the papers are under the general supervision of circulation managers. But for purposes of street distribution each paper has divided metropolitan Los Angeles into geographic districts. Each district is under the direct and close supervision of a district manager. His function in the mechanics of distribution is to supply the newsboys in his district with papers which he obtains from the publisher and to turn over to the publisher the receipts which he collects from their sales, either directly or with the assistance of "checkmen" or "main spot" boys.[10] The latter, stationed at the important corners or "spots" in the district, are newsboys who, among other things, receive delivery of the papers, redistribute them to other newsboys stationed at less important corners, and collect receipts from their sales.[11] For that service, which occupies a minor portion

---

[10] The Examiner, the Herald, and the News all employ "main spot" boys or checkmen; the Times does not.

[11] The Times district managers deliver the papers directly to the newsboys and collect directly from them. On the other papers district managers may deliver bundles of papers to the checkmen or directly to the newsboys themselves. The Times customarily transports its newsboys to their "spots" from the Times building, where they first report and pick up their papers. The other respondents offer similar transportation to those of their newsboys who desire it.

of their working day, the checkmen receive a small salary from the publisher.[12]   The bulk of their day, however, they spend in hawking papers at their "spots" like other full-time newsboys.   A large part of the appropriate units selected by the Board for the News and the Herald are checkmen who, in that capacity, clearly are employees of those papers.

The newsboys' compensation consists in the difference between the prices at which they sell the papers and the prices they pay for them.   The former are fixed by the publishers and the latter are fixed either by the publishers or, in the case of the News, by the district manager.[13]   In practice the newsboys receive their papers on credit. They pay for those sold either sometime during or after the close of their selling day, returning for credit all unsold papers.[14]   Lost or otherwise unreturned papers, however, must be paid for as though sold.   Not only is the "profit" per paper thus effectively fixed by the publisher, but substantial control of the newsboys' total "take home" can be effected through the ability to designate their sales areas and the power to determine the number of papers allocated to each.   While as a practical matter this power is not exercised fully, the newsboys' "right" to decide how many papers they will take is also not absolute.   In practice, the Board found, they cannot determine the size of their established order without the cooperation of the district manager.   And often the number of papers they must take is determined unilaterally by the district managers.

In addition to effectively fixing the compensation, respondents in a variety of ways prescribe, if not the

---

[12] In the case of the Examiner these "main spot" boys, although performing services similar to those of checkmen, are less closely knit to the publisher and sometimes receive no compensation for their services.

[13] See *infra*, note 15.

[14] Newsboys selling the Herald in one residential area do not receive credit for *all* unsold papers.

**118**

minutiae of daily activities, at least the broad terms and conditions of work. This is accomplished largely through the supervisory efforts of the district managers, who serve as the nexus between the publishers and the newsboys.[15] The district managers assign "spots" or corners to which the newsboys are expected to confine their selling activities.[16] Transfers from one "spot" to another may be ordered by the district manager for reasons of discipline or efficiency or other cause. Transportation to the spots from the newspaper building is offered by each of respondents. Hours of work on the spots are determined not simply by the impersonal pressures of the market, but to a real extent by explicit instructions from the district managers. Adherence to the prescribed hours is observed closely by the district managers or other supervisory agents of the publishers. Sanctions, varying in severity

---

[15] Admittedly the Times, Examiner, and Herald district managers are employees of their respective papers. While the News urged earnestly that its managers are not its employees, the Board found otherwise. They do not operate on a formal salary basis but they receive guaranteed minimum payments which the Board found are "no more than a fixed salary bearing another label." And while they, rather than the publisher, fix the price of the paper to the newsboy, the Board found, on substantial evidence, that they function for the News in specified districts, distribute racks, aprons, advertising placards from the News to the newsboys, give instructions as to their use, supervise the redistributing activities of the checkmen (themselves clearly employees of the News), and hand out News checks to the checkmen for their services. On this and other evidence suggesting that however different may be their formal arrangements, News district managers bear substantially the same relation to the publisher on one hand and the newsboys on the other as do the other district managers, the Board concluded that they were employees of the paper.

[16] Although from time to time these "spots" are bought and sold among the vendors themselves, without objection by district managers and publishers, this in no way negates the need for the district managers' implicit approval of a spotholder or their authority to remove vendors from their "spots" for reasons of discipline or efficiency.

from reprimand to dismissal, are visited on the tardy and the delinquent. By similar supervisory controls minimum standards of diligence and good conduct while at work are sought to be enforced. However wide may be the latitude for individual initiative beyond those standards, district managers' instructions in what the publishers apparently regard as helpful sales technique are expected to be followed. Such varied items as the manner of displaying the paper, of emphasizing current features and headlines, and of placing advertising placards, or the advantages of soliciting customers at specific stores or in the traffic lanes are among the subjects of this instruction. Moreover, newsboys are furnished with sales equipment, such as racks, boxes and change aprons, and advertising placards by the publishers. In this pattern of employment the Board found that the newsboys are an integral part of the publishers' distribution system and circulation organization. And the record discloses that the newsboys and checkmen feel they are employees of the papers; and respondents' supervisory employees, if not respondents themselves, regard them as such.

In addition to questioning the sufficiency of the evidence to sustain these findings, respondents point to a number of other attributes characterizing their relationship with the newsboys [17] and urge that on the entire

[17] E. g., that there is either no evidence in the record to show, or the record explicitly negatives, that respondents carry the newsboys on their payrolls, pay "salaries" to them, keep records of their sales or locations, or register them as "employees" with the Social Security Board, or that the newsboys are covered by workmen's compensation insurance or the California Compensation Act. Furthermore, it is urged the record shows that the newsboys all sell newspapers, periodicals and other items not furnished to them by their respective publishers, assume the risk for papers lost, stolen or destroyed, purchase and sell their "spots," hire assistants and relief men and make arrangements among themselves for the sale of competing or leftover papers.

record the latter cannot be considered their employees. They base this conclusion on the argument that by common-law standards the extent of their control and direction of the newsboys' working activities creates no more than an "independent contractor" relationship and that common-law standards determine the "employee" relationship under the Act. They further urge that the Board's selection of a collective bargaining unit is neither appropriate nor supported by substantial evidence.[18]

## I.

The principal question is whether the newsboys are "employees." Because Congress did not explicitly define the term, respondents say its meaning must be determined by reference to common-law standards. In their view "common-law standards" are those the courts have applied in distinguishing between "employees" and "independent contractors" when working out various problems unrelated to the Wagner Act's purposes and provisions.

The argument assumes that there is some simple, uniform and easily applicable test which the courts have used, in dealing with such problems, to determine whether persons doing work for others fall in one class or the other. Unfortunately this is not true. Only by a long and tortuous history was the simple formulation worked out which has been stated most frequently as "the test" for deciding whether one who hires another is responsible in tort for his wrongdoing.[19] But this formula has been by no means

---

[18] They have abandoned here the contention, made in the circuit court, that the Act does not reach their controversies with the newsboys because they do not affect commerce.

[19] The so-called "control test" with which common-law judges have wrestled to secure precise and ready applications did not escape the difficulties encountered in borderland cases by its reformulation in the Restatement of the Law of Agency § 220. That even at the common law the control test and the complex of incidents evolved in

exclusively controlling in the solution of other problems. And its simplicity has been illusory because it is more largely simplicity of formulation than of application. Few problems in the law have given greater variety of application and conflict in results than the cases arising in the borderland between what is clearly an employer-employee relationship and what is clearly one of independent, entrepreneurial dealing.[20] This is true within the limited field of determining vicarious liability in tort. It becomes more so when the field is expanded to include all of the possible applications of the distinction.

It is hardly necessary to stress particular instances of these variations or to emphasize that they have arisen principally, first, in the struggle of the courts to work out common-law liabilities where the legislature has given no guides for judgment,[21] more recently also under statutes which have posed the same problem for solution in the light of the enactment's particular terms and purposes.[22]

---

applying it to distinguish an "employee" from an "independent contractor," for purposes of vicarious liability in tort, did not necessarily have the same significance in other contexts, compare *Lumley* v. *Gye* [1853] El. & Bl. 216, and see also the cases collected in 21 A. L. R. 1229 *et seq.;* 23 A. L. R. 984 *et seq.*

[20] See, e. g., Stevens, The Test of the Employment Relation (1939) 38 Mich. L. Rev. 188; Steffen, Independent Contractor and the Good Life (1935) 2 U. of Chi. L. Rev. 501; Leidy, Salesmen as Independent Contractors (1938) 28 Mich. L. Rev. 365; N. Y. Law Revision Commission Report, 1939 (1939) Legislative Document No. 65 (K).

[21] See note 20 *supra.*

[22] Compare, e. g., *McKinley* v. *Payne Lumber Co.,* 200 Ark. 1114, 143 S. W. 2d 38; *Industrial Comm'n* v. *Northwestern Ins. Co.,* 103 Colo. 550, 88 P. 2d 560; *Schomp* v. *Fuller Brush Co.,* 124 N. J. L. 487, 12 A. 2d 702; 126 N. J. L. 368, 19 A. 2d 780; *Unemployment Compensation Comm'n* v. *Jefferson Ins. Co.,* 215 N. C. 479, 2 S. E. 2d 584; *Singer Sewing Machine Co.* v. *Unemployment Compensation Comm'n,* 167 Ore. 142, 103 P. 2d 708, with *McCain* v. *Crossett Lumber Co.,* 174 S. W. 2d 114 (Ark.); *Hill Hotel Co.* v. *Kinney,* 138 Neb. 760, 295

It is enough to point out that, with reference to an identical problem, results may be contrary over a very considerable region of doubt in applying the distinction, depending upon the state or jurisdiction where the determination is made;[23] and that within a single jurisdiction a person who, for instance, is held to be an "independent contractor" for the purpose of imposing vicarious liability in tort may be an "employee" for the purposes of particular legislation, such as unemployment compensation. See, *e. g., Globe Grain & Milling Co.* v. *Industrial Comm'n,* 98 Utah 36, 91 P. 2d 512. In short, the assumed simplicity and uniformity, resulting from application of "common-law standards," does not exist.

Mere reference to these possible variations as characterizing the application of the Wagner Act in the treatment of persons identically situated in the facts surrounding their employment and in the influences tending to disrupt it, would be enough to require pause before accepting a thesis which would introduce them into its administration. This would be true, even if the statute itself had indicated less clearly than it does the intent they should not apply.

Two possible consequences could follow. One would be to refer the decision of who are employees to local state law. The alternative would be to make it turn on a sort of pervading general essence distilled from state law. Congress obviously did not intend the former result. It

---

N. W. 397; *Washington Recorder Co.* v. *Ernst,* 199 Wash. 176, 91 P. 2d 718; *Wisconsin Bridge Co.* v. *Industrial Comm'n,* 233 Wis. 467, 290 N. W. 199. See generally Wolfe, Determination of Employer-Employee Relationships in Social Legislation (1941) 41 Col. L. Rev. 1015. And see note 23 *infra.*

[23] Compare *Stockwell* v. *Morris,* 46 Wyo. 1, with *Auer* v. *Sinclair Refining Co.,* 103 N. J. L. 372; *Schomp* v. *Fuller Brush Co.,* 124 N. J. L. 487, 126 N. J. L. 368, with *Fuller Brush Co.* v. *Industrial Comm'n,* 99 Utah 97; *Stover Bedding Co.* v. *Industrial Comm'n,* 99 Utah 423, with *Maltz* v. *Jackoway-Katz Cap Co.,* 336 Mo. 1000.

would introduce variations into the statute's operation as wide as the differences the forty-eight states and other local jurisdictions make in applying the distinction for wholly different purposes. Persons who might be "employees" in one state would be "independent contractors" in another. They would be within or without the statute's protection depending not on whether their situation falls factually within the ambit Congress had in mind, but upon the accidents of the location of their work and the attitude of the particular local jurisdiction in casting doubtful cases one way or the other. Persons working across state lines might fall in one class or the other, possibly both, depending on whether the Board and the courts would be required to give effect to the law of one state or of the adjoining one, or to that of each in relation to the portion of the work done within its borders.

Both the terms and the purposes of the statute, as well as the legislative history, show that Congress had in mind no such patchwork plan for securing freedom of employees' organization and of collective bargaining. The Wagner Act is federal legislation, administered by a national agency, intended to solve a national problem on a national scale. Cf. *e. g.,* Sen. Rep. No. 573, 74th Cong., 1st Sess. 2–4. It is an Act, therefore, in reference to which it is not only proper but necessary for us to assume, "in the absence of a plain indication to the contrary, that Congress . . . is not making the application of the federal act dependent on state law." *Jerome* v. *United States,* 318 U. S. 101, 104. Nothing in the statute's background, history, terms or purposes indicates its scope is to be limited by such varying local conceptions, either statutory or judicial, or that it is to be administered in accordance with whatever different standards the respective states may see fit to adopt for the disposition of unrelated, local problems. Consequently, so far as the meaning of "employee" in this statute is concerned, "the federal law must prevail no matter what name is given to the interest or

right by state law." *Morgan* v. *Commissioner*, 309 U. S. 78, 81; cf. *Labor Board* v. *Blount*, 131 F. 2d 585 (C. C. A.).

## II.

Whether, given the intended national uniformity, the term "employee" includes such workers as these newsboys must be answered primarily from the history, terms and purposes of the legislation. The word "is not treated by Congress as a word of art having a definite meaning. . . ." Rather "it takes color from its surroundings . . . [in] the statute where it appears," *United States* v. *American Trucking Assns.*, 310 U. S. 534, 545, and derives meaning from the context of that statute, which "must be read in the light of the mischief to be corrected and the end to be attained." *South Chicago Coal & Dock Co.* v. *Bassett*, 309 U. S. 251, 259; cf. *New Negro Alliance* v. *Sanitary Grocery Co.*, 303 U. S. 552; *Drivers' Union* v. *Lake Valley Co.*, 311 U. S. 91.

Congress, on the one hand, was not thinking solely of the immediate technical relation of employer and employee. It had in mind at least some other persons than those standing in the proximate legal relation of employee to the particular employer involved in the labor dispute.[24] It cannot be taken, however, that the purpose was to include all other persons who may perform service for another or was to ignore entirely legal classifications made for other purposes. Congress had in mind a wider field than the narrow technical legal relation of "master and servant," as the common law had worked this out in all its variations, and at the same time a narrower one than the entire area of rendering service to others. The question comes down therefore to how much was included of the inter-

---

[24] Cf. notes 28–30 *infra* and text.

mediate region between what is clearly and unequivocally "employment," by any appropriate test, and what is as clearly entrepreneurial enterprise and not employment.

It will not do, for deciding this question as one of uniform national application, to import wholesale the traditional common-law conceptions or some distilled essence of their local variations as exclusively controlling limitations upon the scope of the statute's effectiveness. To do this would be merely to select some of the local, hairline variations for nation-wide application and thus to reject others for coverage under the Act. That result hardly would be consistent with the statute's broad terms and purposes.

Congress was not seeking to solve the nationally harassing problems with which the statute deals by solutions only partially effective. It rather sought to find a broad solution, one that would bring industrial peace by substituting, so far as its power could reach, the rights of workers to self-organization and collective bargaining for the industrial strife which prevails where these rights are not effectively established. Yet only partial solutions would be provided if large segments of workers about whose technical legal position such local differences exist should be wholly excluded from coverage by reason of such differences. Yet that result could not be avoided, if choice must be made among them and controlled by them in deciding who are "employees" within the Act's meaning. Enmeshed in such distinctions, the administration of the statute soon might become encumbered by the same sort of technical legal refinement as has characterized the long evolution of the employee - independent contractor dichotomy in the courts for other purposes. The consequences would be ultimately to defeat, in part at least, the achievement of the statute's objectives. Congress no more intended to

import this mass of technicality as a controlling "standard" for uniform national application than to refer decision of the question outright to the local law.

The Act, as its first section states, was designed to avert the "substantial obstructions to the free flow of commerce" which result from "strikes and other forms of industrial strife or unrest" by eliminating the causes of that unrest. It is premised on explicit findings that strikes and industrial strife themselves result in large measure from the refusal of employers to bargain collectively and the inability of individual workers to bargain successfully for improvements in their "wages, hours or other working conditions" with employers who are "organized in the corporate or other forms of ownership association." Hence the avowed and interrelated purposes of the Act are to encourage collective bargaining and to remedy the individual worker's inequality of bargaining power by "protecting the exercise . . . of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 49 Stat. 449, 450.

The mischief at which the Act is aimed and the remedies it offers are not confined exclusively to "employees" within the traditional legal distinctions separating them from "independent contractors." Myriad forms of service relationship, with infinite and subtle variations in the terms of employment, blanket the nation's economy. Some are within this Act, others beyond its coverage. Large numbers will fall clearly on one side or on the other, by whatever test may be applied. But intermediate there will be many, the incidents of whose employment partake in part of the one group, in part of the other, in varying proportions of weight. And consequently the legal pendulum, for purposes of applying the statute, may swing one way

or the other, depending upon the weight of this balance and its relation to the special purpose at hand.

Unless the common-law tests are to be imported and made exclusively controlling, without regard to the statute's purposes, it cannot be irrelevant that the particular workers in these cases are subject, as a matter of economic fact, to the evils the statute was designed to eradicate and that the remedies it affords are appropriate for preventing them or curing their harmful effects in the special situation. Interruption of commerce through strikes and unrest may stem as well from labor disputes between some who, for other purposes, are technically "independent contractors" and their employers as from disputes between persons who, for those purposes, are "employees" and their employers. Cf. *Drivers' Union* v. *Lake Valley Co.*, 311 U. S. 91. Inequality of bargaining power in controversies over wages, hours and working conditions may as well characterize the status of the one group as of the other. The former, when acting alone, may be as "helpless in dealing with an employer," as "dependent . . . on his daily wage" and as "unable to leave the employ and to resist arbitrary and unfair treatment" as the latter. For each, "union . . . [may be] essential to give . . . opportunity to deal on equality with their employer." [25] And for each, collective bargaining may be appropriate and effective for the "friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions." [26]  49 Stat. 449.  In

---

[25] *American Steel Foundries Co.* v. *Tri-City Council*, 257 U. S. 184, 209, cited in H. R. Rep. No. 1147, 74th Cong., 1st Sess. 10; cf. *Bakery & Pastry Drivers* v. *Wohl*, 315 U. S. 769.

[26] The practice of self-organization and collective bargaining to resolve labor disputes has for some time been common among such varied types of "independent contractors" as musicians (How Collective Bargaining Works (20th Century Fund, 1942) 848–866; Proceedings of the 47th Annual Convention of the American Federation

short, when the particular situation of employment combines these characteristics, so that the economic facts of the relation make it more nearly one of employment than of independent business enterprise with respect to the ends sought to be accomplished by the legislation, those characteristics may outweigh technical legal classification for purposes unrelated to the statute's objectives and bring the relation within its protections.

To eliminate the causes of labor disputes and industrial strife, Congress thought it necessary to create a balance of forces in certain types of economic relationships. These do not embrace simply employment associations in which controversies could be limited to disputes over proper "physical conduct in the performance of the service." [27] On the contrary, Congress recognized those economic relationships cannot be fitted neatly into the containers designated "employee" and "employer" which an earlier law had shaped for different purposes. Its Reports on the bill disclose clearly the understanding that "employers and employees not in proximate relationship may be drawn into common controversies by economic forces," [28] and that the very disputes sought to be avoided might involve

---

of Musicians (1942)), actors (see, e. g., Collective Bargaining by Actors (1926) Bureau of Labor Statistics, Bulletin No. 402; Harding, The Revolt of the Actors (1929); Ross, Stars and Strikes (1941)), and writers (see, e. g., Rosten, Hollywood (1941); Ross, Stars and Strikes (1941) 48–63), and such atypical "employees" as insurance agents, artists, architects and engineers (see, e. g., Proceedings of the 2d Convention of the UOPWA, C. I. O. (1938); Proceedings of the 3d Convention of the UOPWA, C. I. O. (1940); Handbook of American Trade Unions (1936), Bureau of Labor Statistics, Bull. No. 618, 291–293; Constitution and By-Laws of the IFTEAD of the A. F. L., 1942).

[27] Control of "physical conduct in the performance of the service" is the traditional test of the "employee relationship" at common law. Cf., e. g., Restatement of the Law of Agency § 220 (1).

[28] Sen. Rep. No. 573, 74th Cong., 1st Sess. 7.

"employees [who] are at times brought into an economic relationship with employers who are not their employers." [29] In this light, the broad language of the Act's definitions, which in terms reject conventional limitations on such conceptions as "employee," "employer," and "labor dispute," [30] leaves no doubt that its applicability is to be determined broadly, in doubtful situations, by underlying economic facts rather than technically and exclusively by previously established legal classifications. Cf. *Labor Board* v. *Blount, supra.*

Hence "technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants" have been rejected in various applications of this Act both here (*International Association of Machinists* v. *Labor Board,* 311 U. S. 72, 80–81; *H. J. Heinz Co.* v. *Labor Board,* 311 U. S. 514, 520–521) [31] and in other federal courts (*Labor Board* v. *Condenser Corp.,* 128 F. 2d 67 (C. C. A.); *North Whittier Heights Citrus Assn.* v. *Labor Board,* 109 F. 2d 76, 82 (C. C. A.); *Labor Board* v. *Blount, supra*). There is no good reason for invoking them to restrict the scope of the term "employee" sought to be done in this case. That term, like other provisions, must be understood with reference to the purpose of the Act and the facts involved in the economic relationship.[32] "Where all the conditions of the relation require protection, protection ought to be given." [33]

---

[29] Sen. Rep. No. 573, 74th Cong., 1st Sess. 6.

[30] Cf. *Phelps-Dodge Corp.* v. *Labor Board,* 313 U. S. 177; and compare *Drivers' Union* v. *Lake Valley Co.,* 311 U. S. 91, with Sen. Rep. No. 573, 74th Cong., 1st Sess. 7.

[31] Compare *Labor Board* v. *Waterman S. S. Corp.,* 309 U. S. 206; *Phelps-Dodge Corp.* v. *Labor Board,* 313 U. S. 177.

[32] Cf. *South Chicago Coal & Dock Co.* v. *Bassett,* 309 U. S. 251; *Lehigh Valley Coal Co.* v. *Yensavage,* 218 F. 547, 552 (C. C. A.).

[33] *Lehigh Valley Coal Co.* v. *Yensavage,* 218 F. 547, 552 (C. C. A.).

It is not necessary in this case to make a completely definitive limitation around the term "employee." That task has been assigned primarily to the agency created by Congress to administer the Act. Determination of "where all the conditions of the relation require protection" involves inquiries for the Board charged with this duty. Everyday experience in the administration of the statute gives it familiarity with the circumstances and backgrounds of employment relationships in various industries, with the abilities and needs of the workers for self-organization and collective action, and with the adaptability of collective bargaining for the peaceful settlement of their disputes with their employers. The experience thus acquired must be brought frequently to bear on the question who is an employee under the Act. Resolving that question, like determining whether unfair labor practices have been committed, "belongs to the usual administrative routine" of the Board.[34] *Gray* v. *Powell*, 314 U. S. 402, 411. Cf. *Labor Board* v. *Standard Oil Co.*, 138 F. 2d 885, 887–888.

In making that body's determinations as to the facts in these matters conclusive, if supported by evidence, Congress entrusted to it primarily the decision whether the evidence establishes the material facts. Hence in reviewing the Board's ultimate conclusions, it is not the court's function to substitute its own inferences of fact for the Board's, when the latter have support in the record. *Labor Board* v. *Nevada Copper Corp.*, 316 U. S. 105; cf. *Walker* v. *Altmeyer*, 137 F. 2d 531 (C. C. A.). Undoubtedly questions of statutory interpretation, especially when arising in the first instance in judicial proceedings, are for

[34] E. g., Matter of Metro-Goldwyn-Mayer Studios, 7 N. L. R. B. 662, 686–690; Matter of KMOX Broadcasting Station, 10 N. L. R. B. 479; Matter of Interstate Granite Corp., 11 N. L. R. B. 1046; Matter of Sun Life Ins. Co., 15 N. L. R. B. 817; Matter of Kelly Co., 34 N. L. R. B. 325; Matter of John Yasek, 37 N. L. R. B. 156.

the courts to resolve, giving appropriate weight to the judgment of those whose special duty is to administer the questioned statute. *Norwegian-Nitrogen Products Co.* v. *United States,* 288 U. S. 294; *United States* v. *American Trucking Assns.,* 310 U. S. 534. But where the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court's function is limited. Like the commissioner's determination under the Longshoremen's & Harbor Workers' Act,[35] that a man is not a "member of a crew" (*South Chicago Coal & Dock Co.* v. *Bassett,* 309 U. S. 251) or that he was injured "in the course of employment" (*Parker* v. *Motor Boat Sales,* 314 U. S. 244) and the Federal Communications Commission's determination [36] that one company is under the "control" of another (*Rochester Telephone Corp.* v. *United States,* 307 U. S. 125), the Board's determination that specified persons are "employees" under this Act is to be accepted if it has "warrant in the record" and a reasonable basis in law.

In this case the Board found that the designated newsboys work continuously and regularly, rely upon their earnings for the support of themselves and their families, and have their total wages influenced in large measure by the publishers, who dictate their buying and selling prices, fix their markets and control their supply of papers. Their hours of work and their efforts on the job are supervised and to some extent prescribed by the publishers or their agents. Much of their sales equipment and advertising materials is furnished by the publishers with the intention that it be used for the publisher's benefit. Stating that "the primary consideration in the determination of the applicability of the statutory definition is whether

---

[35] 44 Stat. 1424, 33 U. S. C. § 901 *et seq.*

[36] Under § 2 (b) of the Communications Act of 1934, 48 Stat. 1064, 1065, 47 U. S. C. § 152 (b).

effectuation of the declared policy and purposes of the Act comprehend securing to the individual the rights guaranteed and protection afforded by the Act," the Board concluded that the newsboys are employees. The record sustains the Board's findings and there is ample basis in the law for its conclusion.

## III.

The Board's selection of the collective bargaining units also must be upheld. The units chosen for the News and the Herald consist of all full-time[37] newsboys and checkmen engaged to sell the papers in Los Angeles. Bootjackers, temporary, casual and part-time[38] newsboys are excluded. The units designated for the Times and the Examiner consist of newsboys selling at established spots[39] in Los Angeles[40] four or more hours per day five or more days per week, except temporary newsboys.[41]

The Board predicated its designations in part upon the finding that the units included, in general, men who were responsible workers, continuously and regularly employed as vendors and dependent upon their sales for their liveli-

[37] Full-time newsboys for the Herald includes those who regularly sell to the public five or more editions five or more days per week. Full-time newsboys for the News includes those who regularly sell to the general public the fifth, sixth, eighth, ninth and tenth, or the sixth, eighth, ninth and tenth editions five or more days per week, or the fourth and earlier editions for at least four hours daily between 4:00 a. m. and 10:00 a. m. five days per week.

[38] Part-time newsboys for the Herald means those selling less than five editions daily or for less than five days per week.

[39] Established spots are corners at which newsboys sold those papers for at least five or more days per week during at least six consecutive months.

[40] Glendale is included in the Times unit.

[41] Temporary newsboys are those selling for less than thirty-one consecutive days.

hood, while schoolboys and transient or casual workers were excluded. The discretion which Congress vested in the Board to determine an appropriate unit is hardly overstepped by the choice of a unit based on a distinction so clearly consistent with the need for responsible bargaining. That the Board's selection emphasizes difference in tenure rather than function is, on this record certainly, no abuse of discretion.

Nor is there substance in the objection that the Board's designations on the one hand fail to embrace *all* workers who in fact come within the responsible or stable full-time category generically stated, and on the other hand fail to exclude all who in fact come within the schoolboy or more volatile part-time category. The record does not suggest that the units designated, at least so far as Los Angeles newsboys are concerned, do not substantially effectuate the Board's theory or embrace a large portion of those who would make up a stable bargaining group based on responsible tenure and full-time work. In these matters the Board cannot be held to mathematical precision. If it chooses to couch its orders in terms which for good reasons it regards effective to accomplish its stated ends, peripheral or hypothetical deviations will not defeat an otherwise appropriate order.

Another objection urged by the Times, the Herald and the Examiner is to the Board's exclusion of suburban newsboys [42] from the units on the ground they were not organized by the union. The Board found that although all vendors in metropolitan Los Angeles were eligible for membership, the union had not been extended to the suburban groups generally and that no other labor organization was seeking to represent respondents' employees. There is no suggestion either that the union deliberately

---

[42] Except newsboys selling the Times in Glendale.

excluded suburban newsboys who sought admission or that suburban newsboys have displayed any interest in collective bargaining or self-organization.

Wide variations in the forms of employee self-organization and the complexities of modern industrial organization make difficult the use of inflexible rules as the test of an appropriate unit. Congress was informed of the need for flexibility in shaping the unit to the particular case [43] and accordingly gave the Board wide discretion in the matter. Its choice of a unit is limited specifically only by the requirement that it be an "employer unit, craft unit, plant unit, or subdivision thereof" and that the selection be made so as "to insure to employees the full benefit of their right to self-organization and to collective bargaining, and otherwise to effectuate the policies of the Act." *Pittsburgh Plate Glass Co.* v. *Labor Board,* 313 U. S. 146. The flexibility which Congress thus permitted has characterized the Board's administration of the section and has led it to resort to a wide variety of factors in case-to-case determination of the appropriate unit.[44] Among the considerations to which it has given weight is the extent of organization of the union requesting certification or collective bargaining. This is done on the expressed theory that it is desirable in the determination of an appropriate unit to render collective bargaining of the company's employees an immediate possibility.[45] No

---

[43] Hearings before Committee on Education and Labor on S. 1958, 74th Cong., 1st Sess. 83.

[44] E. g., see First Annual Report of the National Labor Relations Board 112–120; Second Annual Report of the National Labor Relations Board 122–140; Third Annual Report of the National Labor Relations Board 156–197; Fourth Annual Report of the National Labor Relations Board 82–97; Fifth Annual Report of the National Labor Relations Board 63–72; Sixth Annual Report of the National Labor Relations Board 63–71.

[45] Matter of Gulf Oil Corp., 4 N. L. R. B. 133.

plausible reason is suggested for withholding the benefits of the Act from those here seeking it until a group of geographically separated employees becomes interested in collective bargaining. In the circumstances disclosed by this record we cannot say the Board's conclusions are lacking in a "rational basis."

The judgments are reversed and the causes are remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE REED concurs in the result. He is of the opinion that the test of coverage for employees is that announced by the Board in the matter of Stockholders Publishing Company, Inc., and Los Angeles Newsboys Local Industrial Union No. 75, C. I. O., and other similar cases, decided January 9, 1941, 28 N. L. R. B. 1006, 1022–23.

MR. JUSTICE ROBERTS:

I think the judgment of the Circuit Court of Appeals should be affirmed. The opinion of that court reported in 136 F. 2d 608, seems to me adequately to state the controlling facts and correctly to deal with the question of law presented for decision. I should not add anything were it not for certain arguments presented here and apparently accepted by the court.

I think it plain that newsboys are not "employees" of the respondents within the meaning and intent of the National Labor Relations Act. When Congress, in § 2 (3), said "The term 'employee' shall include any employee, . . ." it stated as clearly as language could do it that the provisions of the Act were to extend to those who, as a result of decades of tradition which had become part of the common understanding of our people, bear the named relationship. Clearly also Congress did not dele-

gate to the National Labor Relations Board the function of defining the relationship of employment so as to promote what the Board understood to be the underlying purpose of the statute. The question who is an employee, so as to make the statute applicable to him, is a question of the meaning of the Act and, therefore, is a judicial and not an administrative question.

I do not think that the court below suggested that the federal courts sitting in the various states must determine whether a given person is an employee by application of either the local statutes or local state decisions. Quite the contrary. As a result of common law development, many prescriptions of federal statutes take on meaning which is uniformly ascribed to them by the federal courts, irrespective of local variance. *Funk* v. *United States,* 290 U.S. 371. This court has repeatedly resorted to just such considerations in defining the very term "employee" as used in other federal statutes, as the opinion of the court below shows. There is a general and prevailing rule throughout the Union as to the indicia of employment and the criteria of one's status as employee. Unquestionably it was to this common, general, and prevailing understanding that Congress referred in the statute and, according to that understanding, the facts stated in the opinion below, and in that of this court, in my judgment, demonstrate that the newsboys were not employees of the newspapers.

It is urged that the Act uses the term in some loose and unusual sense such as justifies the Board's decision because Congress added to the definition of employee above quoted these further words: "and shall not be limited to the employees of a particular employer, unless the Act explicitly states otherwise, . . ." The suggestion seems to be that Congress intended that the term employee should mean those who were not in fact employees, but it

is perfectly evident, not only from the provisions of the Act as a whole but from the Senate Committee's Report, that this phrase was added to prevent any misconception of the provisions whereby employees were to be allowed freely to combine and to be represented in collective bargaining by the representatives of their union. Congress intended to make it clear that employee organizations did not have to be organizations of the employees of any single employer. But that qualifying phrase means no more than this and was never intended to permit the Board to designate as employees those who, in traditional understanding, have no such status.