**NORTHERN PAC. RY. CO. v. REYNOLDS**
(two cases).

Civ. Nos. 674, 899.

District Court, D. Minnesota,
Third Division.

June 14, 1946.

L. B. DaPonte, M. L. Countryman, Jr., and Conrad Olson, all of St. Paul, Minn., for plaintiff.

Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., and Maurice Wolk, Sp. Asst. to Atty. Gen., of Washington, D. C., for defendant.

Mulholland, Robie & McEwen, of Toledo, Ohio, and Vennum, Neville & Wright, of Minneapolis, Minn., for Railway Employes' Department of American Federation of Labor and others, intervenors.

JOYCE, District Judge.

These are companion cases for the recovery of taxes paid under protest. Similar litigation is pending wherein the Great Northern Railway Company and Chicago, St. Paul, Minneapolis & Omaha Railway Company [1] are plaintiffs which involves similar factual situations and identical questions of law. The taxes involved were assessed under 26 U.S.C.A. Int.Rev.Code, § 1500 et seq., all subsequent references by section number are to the Internal Revenue Code, Title 26 U.S.C.A. known as the Carriers Taxing Act. Various railroad labor unions have been permitted to intervene under Rule 24 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, in the interests of the employees affected by this litigation.

Plaintiff is a corporation operating a transcontinental railway system. For many years past it has had contracts with Addison Miller, Inc. and Addison Miller Company for the operation of its ore dock at Superior, Wisconsin, its coal docks, sand houses, cinder pits, as well as its car

[1] 68 F.Supp. 499.

icing and car cleaning facilities. Briefly, the ore dock is a facility where iron ore is brought by railroad directly from the mines, deposited in the bins and loaded from there into the ore boats which operate on the Great Lakes. The coal docks and sand houses are located along the railroad tracks where coal and sand are kept available for use in locomotives. The cinder pits likewise are for the service of locomotives. The car icing consists in loading ice into refrigerator cars at icing points—a service furnished to shippers by the railroad. The car cleaning consists of washing and cleaning railroad cattle cars and readying them for use. All of this work was done under the contracts by laborers employed by one or the other of the Addison Miller Companies for the periods involved here. Plaintiff also had contracts with the A. W. Partridge Company for the operation of boarding camps in the western part of the country. It is often necessary for railroad crews to work at isolated points for some period of time. In such cases the men sleep and eat in railroad cars adapted for these purposes which are designated as "camps" and which were operated by the Partridge Company. The men who perform the above-outlined operations under the Addison Miller or Partridge contracts have been classified by the defendant Collector of Internal Revenue as employees of the plaintiff railroad for the purpose of the Carriers Taxing Act and taxes were assessed accordingly.

Both the Addison Miller and Partridge Companies are independent concerns and the record does not show that plaintiff or any other railroad owns or controls any of these companies. Their principal business is performing various contract services for railroads and they have done so for many years. They hire, fire, pay and supervise their own employees. Their employees have been considered to be under the Social Security Act and the companies have paid the taxes assessed thereunder. In fact, these companies have been conducted and treated legally as any other business concern. However, it is the position of the defendant Collector here that by the nature of their work some of these contractors' employees are subject to such control and direction by the plaintiff that they are within the scope of railroad retirement legislation while other employees are not. For example, the Collector has ruled that Addison Miller employees engaged in cutting ice and storing it in ice houses are not employees of plaintiff, while Addison Miller employees who put the same ice into refrigerator cars are.

The question is essentially one of statutory construction. The Carriers Taxing Act, as far as material here, levies a tax both on employees (Sec. 1500) and employers (Sec. 1520) and the employer has the duty of collecting the tax on employees by deducting it from the employees' compensation (Sec. 1501). Section 1532 is entitled "definitions" and reads in part:

"(a) Employer. The term 'employer' means any carrier * * * and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service * * * in connection with the transportation of passengers or property by railroad, * * *.

"(b) Employee. The term 'employee' means any person in the service of one or more employers for compensation. * * *

"(d) Service. An individual is in the service of an employer * * * if he is subject to the continuing authority of the employer to supervise and direct the manner of rendition of his service, which service he renders for compensation: * * *

"(e) Compensation. The term 'compensation' means any form of money remuneration earned by an individual for services rendered as an employee to one or more employers * * *."

Defendant's position is that this definition of service in Section 1532(d) above quoted is controlling and the only question is one of fact in each case whether the employee is subject to the "continuing authority" of plaintiff so as to make plaintiff liable for the taxes assessed. It is plaintiff's position that reading the act as a whole it must be construed to exclude those employees who are not in a direct employment relationship with it in the ordinary meaning of the term. The legal

494

question resolves itself into whether the Act discloses an intent on the part of Congress to impose a tax liability on carriers for wages not paid by them but by a company with which the carrier contracted. The question in this case is not whether plaintiff was an "employer" under the Act because that it obviously is; nor is it necessarily that the employees involved are "employees" within the definition of Sec. 1532(b): essentially the question is whether this plaintiff is the employer of these employees within the meaning of the Act.

The parties differ considerably on the approach that should be taken in construing the Act. Plaintiff urges that the terms "employer", "employ", "employee" and "service" were used in the Act in their ordinary sense and relies on the legislative history of the Act in support of its contention. In short, plaintiff urges a literal construction of the Act. Defendant urges a "broader" construction and urges that the "general purposes" of the Act should serve as a guide and that so treated the Act should be construed to include employees of contractors whose work is "integrated" with railroading and "subject to the continuing authority" of the railroad so as to make the railroad liable for the tax.

National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, is cited in support of defendant's theory. That case involved newsboys who sold newspapers in Los Angeles under rather strict regulations of and supervision by the publisher but whose compensation was measured by the "profit" they made on the number of papers sold. The newsboys were held to be not independent contractors but employees of the newspaper for the purposes of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. The Supreme Court held that in determining whether an employment relationship existed under the National Labor Relations Act common law tests developed in determining tort liability should not be used to restrict the meaning of the term "employees" which was not defined in that Act but "that term, like other provisions, must be understood with reference to the purpose of the Act and the facts involved in the economic relationship. 'Where all

the conditions of the relation require protection, protection ought to be given.'" 322 U.S. at page 129, 64 S.Ct. 851, 860, 88 L.Ed. 1170.

▮▮▮ Similarly, in United States v. The Vogue, Inc., 4 Cir., 145 F.2d 609, 612, seamstresses working at home and paid on a piece-work basis were held to be employees and not independent contractors for the purpose of the Social Security Act, 42 U.S.C.A. § 301 et seq., the court saying that "Common law rules as to distinctions between servants and independent contractors throw but little light on the question involved. The Social Security Act, like the Fair Labor Standards Act * * * and the National Labor Relations Act * * *, was enacted pursuant to a public policy unknown to the common law; and its applicability is to be judged rather from the purposes that Congress had in mind than from common law rules worked out for determining tort liability."

In both of these cases the courts were concerned with whether certain "borderline" classifications of employees were within the protection of social·legislation enacted for the benefit of employees, that is, the National Labor Relations Act in the Hearst case and the Social Security Act in The Vogue case. The question in both of those cases was whether the individuals involved were themselves independent contractors or "employees". That situation is not present here. The individuals affected here are employees of either the contractors or of the railroad and are within the coverage and protection of either the Social Security Act and the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., or they are governed by the special legislation enacted for railroad employees—that is, the Railroad Retirement Act of 1937, 45 U.S.C.A. § 228a et seq., the Railway Labor Act, 45 U.S.C.A. § 151 et seq., the Carriers Taxing Act of 1937, 26 U.S.C.A. Int.Rev.Code, § 1500 et seq., and the Railroad Unemployment Insurance Act, 45 U.S.C.A. § 351 et seq. They cannot be within the scope of both schemes of legislation as they are mutually exclusive. However, the Administrator of the Wage and Hour Division of the Department of

Labor has taken the position that Addison Miller employees are subject to the Fair Labor Standards Act, see Walling v. Miller, 8 Cir., 138 F.2d 629; Fleming v. Miller, D.C., 47 F.Supp. 1004 and the defendant Collector has assessed and collected from Addison Miller social security taxes on the same employees as he now claims are employees of Northern Pacific. This variable handling by administrative agencies is certainly confusing to taxpayers and at least is inconsistent with a contention that the statute has a clear social purpose to include these particular employees. As Judge Hutcheson said of such a contention in Allen v. Ocean S. S. Co. of Savannah, 5 Cir., 123 F.2d 469, 470, where it was held that a steamship company whose stock was owned by a railroad was not within the terms of the Carriers Taxing Act: "It is thus quite apparent, with different agencies of the government in a contest with each other over which shall take jurisdiction over and administer upon a citizen, under a statute designed to advise him at once of his duties and rights, that it is only in a Pickwickian sense that appellant declares that the terms of the invoked act quite plainly bring appellee under it. More it is a strong argument for giving the statute a broad common-sense construction rather than a narrow one, sounding in mere logomachy."

In this connection there have been attempts to assess taxes under the Carriers Taxing Act against a bus company owned by a railroad, Interstate Transit Lines v. United States, D.C.Neb., 56 F.Supp. 332, 333, where Judge Donohoe said of the same statute involved here, "The Act of Congress is simple in language and should be easily and readily understood"; against an independent contractor having a contract with a railroad to handle freight, New England Freight Handling Co. v. Hassett, D.C.Mass., 33 F.Supp. 610; against an independently operated steamboat company whose stock was owned by three different railroads, Walling v. Baltimore Steam Packet Co., 4 Cir., 144 F.2d 130. In all of these cases the taxes were refunded and in construing the Carriers Taxing Act all of the courts approached the problem as the ordinary one of ascertaining the intent of Congress in a taxing statute without resort to the existence of a latent social purpose. The problem here will be approached likewise.

Section 1501(a) reads in part: "The tax imposed by section 1500 shall be collected by the employer of the taxpayer by *deducting* the amount of the tax from the compensation of the employee *as and when paid.* * * *" (Italics supplied.)

This language clearly demonstrates that Congress must have contemplated that the employer who was obliged to collect the tax from the employee under this section would have such employee on his payroll. Otherwise a "deduction" from his compensation "as and when paid" would be an impossibility. Similarly, Section 1520 in imposing the tax on employers levies a tax on the "compensation * * * *paid by him* to any employee for services rendered to him * * *" and in subsections 1–5 of Section 1520 the words *"paid to* employees" is used in each instance (italics supplied.) This construction is clear not only from the explicit language referred to but from the practical aspects of the situation. Congress did not intend to impose a tax liability on employers for employees whom they did not pay, did not hire or fire, or whose names they did not even possess, all of which facts are present here. Defendants recognize this but contend that while as a general rule an employee would be in the pay of an employer Congress did not intend to make such a relationship a condition precedent to tax liability and point to section 1532(d) which reads: "An individual is in the service of an employer * * * if he is subject to the continuing authority of the employer to supervise and direct the manner of rendition of his service, *which service he renders for compensation."* (Italics supplied.)

Compensation to be received from whom? The obvious answer is from the employer which presupposes the ordinary employment relationship—a contract for hire. In the absence of more specific language than this I cannot conclude that Congress intended to mean that employees of contractors were to be considered employees of carriers for tax purposes.

Resort to the legislative history of the Carriers Taxing Act demonstrates the correctness of that conclusion. The fact that carriers have contracts with other companies for the performance of transportation services was well known to Congress when this legislation was enacted. The definition of the term "carrier" in the Carriers Taxing Act of 1935, 49 Stat. 974, was lifted from the Railway Labor Act as amended, 48 Stat. 1185, with the intention to retain the same coverage. When that latter legislation was proposed to the Senate—S. 3266—73rd Congress, Second Session—it was proposed to include "any company operating any equipment or facilities or furnishing any services included within the definition of the term 'railroad' and 'transportation' as defined in the Interstate Commerce Act". However, this language was amended and restricted to controlled companies only and in the hearings before the Senate committee on interstate commerce on the above bill Mr. Eastman, Federal Co-ordinator of Transportation, testified: "I am inclined to believe that for the present it would be well not to go beyond carriers and their subsidiaries engaged in transportation." When the Carriers Taxing Act of 1937 was adopted the term "employer" was substituted for the term "carrier" but the definition was otherwise retained except for the inclusion of railroad associations, traffic bureaus, etc., not material here. There was evidently no purpose to change the scope of the Act as far as controlled companies were concerned. The intent of Congress is further indicated by the report of the Committee on Ways and Means, to the House of Representatives 75th Congress First Session on H.R. 7586 which became the Carriers Taxing Act of 1937: "The present act embraces within its scope 'any company which may be directly or indirectly owned (by a carrier) or controlled thereby or under common control therewith, and which operates any equipment or facilities or performs any service (other than trucking service) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transport-ed by railroad, and any receiver, trustee or other individual or body, judicial or otherwise, when in the possession of and operating the business of any such "carrier" '. Under this language coverage extends to a company which is owned or controlled in common by several companies. Exclusions have been extended to casual service and the casual operation of equipment or facilities. In addition to trucking service, it is intended to exclude employees of a contractor who may, for example, be occasionally employed by a 'carrier' to repair a depot or a bridge. Contractors, other than those which perform casual service, would not be excluded, irrespective of whether control be legal or de facto. De facto control may be exercised not only by direct ownership of stock, but by means of agreements, licenses and other devices which insure that the operation of the company is conducted in the interests of the carrier."

Section 1532 has been amended four times since 1937 most recently as of April 8, 1942, and 1532(a) now includes the language, 56 Stat. 209: "That the term 'employer' shall not include any street, inter-urban, or suburban electric railway, unless such railway is operating as a part of a general steam-railroad system of transportation, but shall not exclude any part of the general steam-railroad system of transportation now or hereafter operated by any other motive power. The Interstate Commerce Commission is hereby authorized and directed upon request of the Commissioner of Internal Revenue, or upon complaint of any party interested, to determine after hearing whether any line operated by electric power falls within the terms of this proviso. The term 'employer' shall also include railroad associations, traffic associations, tariff bureaus, demurrage bureaus, weighing and inspection bureaus, collection agencies and other associations, bureaus, agencies, or organizations controlled and maintained wholly or principally by two or more employers as hereinbefore defined and engaged in the performance of services in connection with or incidental to railroad transportation: and railway labor organizations, national in scope, which have been or may be organized in

accordance with the provisions of the Railway Labor Act, as amended, and their State and National legislative committees and their general committees and their insurance departments and their local lodges and divisions, established pursuant to the constitution and bylaws of such organizations. The term 'employer' shall not include any company by reason of its being engaged in the mining of coal, the supplying of coal to an employer where delivery is not beyond the mine tipple, and the operation of equipment or facilities therefor, or in any of such activities."

This legislative history shows to my mind that Congress was attempting to enact tax legislation that was specific and capable of reasonably accurate interpretation. It did this by limiting the scope of the Act to those employers who came within its definitions. When the scope of the Act was extended or limited that was done by amending the definition of "employers" and not the definitions of "employees" or "service". For example, by the definition of "employer" companies, which even though they are owned or controlled by carriers are excluded from the application of the Act, if they operate (1) trucking service, (2) casual services, (3) casual operation of equipment, (4) street railways, unless they operate as a part of the general railroad system, and the Interstate Commerce Commission is given power to determine that fact, and (5) companies operating railroads in coal mines; the definition specifically includes, aside from companies which are subsidiaries of carriers or controlled by them, (1) railroad associations, (2) traffic associations, (3) tariff bureaus, (4) demurrage bureaus, (5) weighing and inspection bureaus, (6) collection agencies, (7) other associations or bureaus operated by two or more railroads jointly, and (8) railway labor organizations and their general committees, insurance departments and local lodges and divisions.

All of this legislation on painstaking definitions of who is to be considered an employer under the Act would be rendered useless and indeed meaningless if defendant's contention here were adopted. I construe the Act to mean that an employee was within its terms only when the party with whom he stood in a direct employment relationship, in the ordinary meaning of the term, was an "employer" within one of the definitions of Section 1532(a).

Two recent decisions show by analogy that the conclusion reached here has been the way that the Act has been construed in practice. Utah Copper Co., et al., v. Railroad Retirement Board, 10 Cir., 129 F.2d 358, involves essentially the same question as here under a peculiar fact situation. A copper company owned all of the stock of a railway company whose principal business was carrying ore from the copper company's mine to a concentrator some 20 miles distant. In 1920 to avoid the recapture provisions of Section 15a of the Interstate Commerce Act, 49 U.S.C.A. § 15a, the two companies entered into an agreement whereby the railroad transferred title to its equipment to the copper company and gave it the right to hire and pay railroad operating crews. The supervision of the movement of trains was retained by the railroad company and in fact the arrangement resulted in no substantial change in the status or work of the railroad men except that their paychecks came from the copper company instead of the railroad company. These employees were held to be under the continuing authority of an employer (the railway company) and to be individual employees within the meaning of the Act. There were also some shop employees involved who had no connection with the railway company but were held to be engaged in work connected with the transportation of passengers and property by railroad. Both the copper company and the railroad company were wholly-owned subsidiaries of another corporation and had interlocking directors. By reason of this common control the copper company was held to be an employer within the meaning of the Act. The significant point is that the court considered that the copper company, because of the common control exerted over it and the railroad company by a parent corporation was an "employer" under the Act even though it was not a carrier. Of course the railway company was also an "employer" as it was a carrier,

so there was no difficulty in holding that the individuals were employees of "one or more employers" within the meaning of 45 U.S.C.A. § 228a (b). Although the question of which company was liable for the taxes on such employees did not arise as that case was under the Railroad Retirement Act of 1937, the companion statute to the Carriers Taxing Act of 1937 it seems logical that the tax liability would be on the copper company which paid the men. In any event, the peculiar fact situation there might be termed a "legal device" which would have no parallel in the case at bar in describing the relationship between the plaintiff railroad and the contractors. Railroad Retirement Board v. Duquesne Warehouse Co., 326 U.S. 446, 66 S.Ct. 238, 242, illustrates the same point. The Duquesne Warehouse Company was a wholly-owned subsidiary of the Pennsylvania Railroad. It operated warehouses on the Pennsylvania and loaded and unloaded Pennsylvania Railroad cars. The question involved was whether the Duquesne Warehouse Company was an employer within the meaning of the Carrier Taxing Act. The Supreme Court held that it was because it was a wholly-owned subsidiary and was rendering a service "in connection with the transportation of * * * property by railroad". Although the Supreme Court expressed no opinion on the question involved here, there is no intimation in that case that the Pennsylvania Railroad was also the employer of the Duquesne Warehouse employees. If defendant's position here were upheld, logically both the railway company in the Utah Copper case and the Pennsylvania Railroad in the Duquesne Warehouse case would be employers of the same employees and therefore taxpayers as well as the other companies which had a direct employment relationship with the employees involved. Such a result would produce confusion and uncertainty never contemplated by Congress and would produce a taxing act impractical to administer.

An examination of the Railroad Retirement Act of 1937 under which both of these cases arose is pertinent by way of analogy. 45 U.S.C.A. § 228a (b) of that Act reads: "The term 'employee' means

(1) any individual in the service of one or more employers for compensation, (2) *any individual who is in the employment relation to one or more employers, * * *.*" (Italics supplied.)

The emphasized portion does not appear in the Carriers Taxing Act, Section 1532(b) although that section does use the term "employment relation" in defining the status of an "employee of a local lodge or division" and delimits the term as follows: "* * * An individual is in the employment relation to a carrier if he is on furlough, subject to call for service within or outside the United States and ready and willing to serve, or on leave of absence, or absent on account of sickness or disability; all in accordance with the established rules and practices in effect on the carrier: Provided however, That an individual shall not be deemed to be in the employment relation to a carrier unless during the last pay-roll period in which he rendered service to it he was with respect to that service in the service of an employer in accordance with subsection (d) of this section. * * *"

From this language alone the conclusion could be drawn that one not on a pay roll was not intended to be in an employment relationship. Why did Congress insert the language "employment relation" into the Railroad Retirement Act of 1937 and even devote a separate subsection, 45 U.S.C.A. § 228a (d), to its definition and not include it in Section 1532(b) of the Carriers Taxing Act? It seems to me that Congress presupposed that one engaged in the "service" of an employer must also stand in an employment relation to him—that is, be on his payroll and have a contract for hire with him. But the term "employment relation" was also given a more specific meaning so that one who was subject to call for service, or on a leave of absence, or sick, or disabled, was still entitled to the benefits of the Act. Of course there would be no purpose in including this definition in the Carriers Taxing Act because if the individual were not on the pay roll no taxes would be assessed on the "compensation paid to [him]." Consistent with this view it has been specifically held that when the employment relationship, in the

ordinary meaning of the term, terminates, the employee is not entitled to the benefits of the Act. Ellers v. Railroad Retirement Board, 2 Cir., 132 F.2d 636; South v. Railroad Retirement Board, 5 Cir., 131 F.2d 748, cert. denied 317 U.S. 701, 63 S.Ct. 525, 87 L.Ed. 561; Gardner v. Railroad Retirement Board, 5 Cir., 148 F.2d 935.

If, as defendant contends, the nature of the work of the employees here is such that they should be included in the scheme of railroad retirement legislation, that is a question for Congress to determine. Both parties have advised the court that such legislation is pending. However, it is the duty of the court to interpret the statute as it is and not to read into it something that is not there.

I therefore make no findings as to the amount of supervision or degree of control exercised by the plaintiff over any of the individuals involved here. As I do find as a fact that none of them stood in an employment relationship to plaintiff, my view of the statute renders that question immaterial. Judgment will be entered in accordance with the views herein expressed. Plaintiff's counsel may submit Findings of Fact, Conclusions of Law and Order for Judgment with copies to opposing counsel.