**JAPAN LINE, LTD., Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**NIPPON YUSEN KAISHA LINES, INC., and Matson Agencies, Inc., Plaintiffs,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Defendants.**

Nos. C–74–1511 SC, C–74–2029 SC.

United States District Court, N. D. California.

Jan. 22, 1975.

Graham & James, San Francisco, Cal., for plaintiff Japan Line.

Edward H. Levi, Atty. Gen., Washington, D.C., James L. Browning Jr., U.S. Atty., San Francisco, Cal., Fritz R. Kahn, Gen. Counsel, I. C. C., Washington, D.C., for defendant United States and Interstate Commerce Comm.

Lillick, McHose, Wheat, Adams & Charles, San Francisco, Cal., for plaintiff Nippon Yusen Kaisha Lines and Matson Agencies Inc.

Before GOODWIN, Circuit Judge, and EAST and CONTI, District Judges.*

CONTI, District Judge:

Today we are called upon to add another chapter to the history of intermodal transportation service. Certain features of the present cases are already familiar ones in the chronicle of that type of service. The plaintiffs, who are Japanese transpacific ocean carriers, have implemented programs which permit their customers to realize significant savings in transit time, freight charges, documentation costs, and insurance losses, when shipping goods from Japan to Chicago via interconnecting transportation services. However, their respective programs have run afoul of the American system of transport regulation, which seems to restrict individual transportation companies either to functioning solely as an underlying carrier or to providing freight forwarding services. Because the plaintiff carriers' programs include rendering services traditionally associated with freight forwarders , the Interstate Commerce Commission has ordered them to cease and desist such activities unless and until they obtain an appropriate ICC freight forwarder's permit.[1] Plaintiffs have requested this court to examine the validity of the Commission's order.

## FACTS

Substantially all the facts of these cases are undisputed and we will confine ourselves to these. The pertinent facts then are as follows.

NYK and Japan Line are Japanese flag ocean carriers with their principal places of business and general offices at Tokyo, Japan. Both operate vessels between international ports in Japan and other international ports, including ports on the west coast of the United States. Each plaintiff has on file with the Federal Maritime Commission appropriate tariffs covering its international operations to and from the United States.

* Honorable Alfred T. Goodwin, United States Circuit Judge for the Ninth Circuit, William G. East, Senior United States District Judge for the District of Oregon, and Samuel Conti, United States District Judge for the Northern District of California, constituting a statutory three-judge District Court by designation of Acting Chief Judge James R. Browning for the Ninth Circuit, dated October 16, 1974.

1. 49 U.S.C. § 1010(a)(1) requires one to obtain a permit from the ICC before rendering freight forwarder services.

The plaintiffs initiated the services in question here simultaneously and in conjunction with the receipt of their first container ships[2] in 1968. NYK calls it questioned service "USIT" service and Japan Line refers to its questioned service as "FAK" service. Shippers requesting USIT service from NYK obtain empty containers from NYK, load the containers, and deliver the packed containers to the NYK container yard or to dockside—all at their own (shippers') expense. Shippers requesting FAK service from Japan Line can follow a similar procedure. At least in some instances, with respect to Japan Line's FAK service, shippers select and pay for consolidators. If that occurs, the consolidator picks up empty containers from Japan Line and brings them to his place of business where he consolidates the shipper's goods, packs the goods into the containers and returns the filled containers to Japan Line's container yard.

The next step in the plaintiffs' services calls for NYK and Japan Line to issue ocean bills of lading to their customers. Their respective bills of lading specifically disclaim cargo liability beyond the port of debarkation (Los Angeles). While the containers are in ocean transit, the plaintiffs' agents in the United States select railroads to provide connecting service to Chicago (sometimes the shippers themselves have previously indicated the rail carrier they prefer) and furnish the chosen rail carriers with the information necessary to prepare the railroad bills of lading. This information also enables the railroads to prepare documents which will qualify the containers for automatic clearance through customs at Los Angeles for ultimate customs clearance at Chicago.

In Los Angeles the containers are taken off NYK's and Japan Line's container ships and placed in their container yards. The railroads move the containers by truck to railroad yards and load them on flatcars for transport to Chicago. At Chicago the railroads off-load the containers for customs inspections and deliver or arrange for the delivery of the containers or the contents thereof to the ultimate consignees pursuant to instructions given them by plaintiffs. Throughout the entire movement of their customers' cargo the plaintiffs, or their agents, act as conduits of information regarding the location and estimated arrival times of shipments. Plaintiffs also advance the exact cost of the inland portion of the journey to the rail carriers. What remuneration the plaintiffs collect from their customers is precisely equal to the sum of the published tariffs of the respective ocean and land carriers involved. Consequently neither NYK nor Japan Line nor their respective agents receive any payment other than their published ocean tariff charges—a sum which their customers must pay whether or not they (the customers) have availed themselves of plaintiffs' USIT or FAK services.

Because plaintiffs utilize containers, their customers realize great savings in transit time and minimize damage and pilferage of their cargo. Furthermore, shippers reduce the fixed cost of shipping from Japan to Chicago when they request plaintiffs' USIT or FAK services, because they need not incur the expense of hiring a freight forwarder to arrange for inland railroad transport, prepare a railroad bill of lading, steer their cargo through customs clearance, and arrange for delivery by motor carrier to the ultimate consignees. All of these tasks will be performed by NYK or Japan Line *free of charge*.

Investigations of NYK's USIT and Japan Line's FAK services were instituted by the ICC on November 21, 1969, and

---

**2.** "Container ships" are vessels built specifically for the transportation of large containers in the hold and on the deck. They were introduced by the ocean carrier industry approximately ten years ago, and they have caused radical changes to be made in the transportation of ocean borne cargo. For example, in many international ports new terminal facilities and special equipment for the moving of containers to and from the vessel have been constructed and this has dramatically reduced transportation time.

December 12, 1969, respectively. The purpose of these investigations was to determine whether the plaintiffs were engaged in rendering services as a freight forwarder without an appropriate ICC permit. An evidentiary hearing was held before an Administrative Law Judge in each case. The Administrative Law Judge in the Japan Line proceeding found that Japan Line was providing freight forwarder services without a permit and thus recommended that a cease and desist order be entered against Japan Line. The Judge in the NYK proceeding, taking a different view of the reach of part IV of the Interstate Commerce Act, came to an opposite conclusion and he recommended that the investigation of NYK's activities be discontinued. On September 20, 1973 the Commission issued the consolidated report and order under review here, Compass Agencies, Inc., Nippon Yusen Kaisha Lines, Inc., and Transmarine Navigation Corporation—Investigation of Operations, 344 I.C.C. 246 (1973). The report states that both plaintiffs were rendering freight forwarder services without appropriate authority. As noted above, the Commission ordered plaintiffs to cease and desist from performing such service until appropriate authority is obtained from the Commission.

■■ Japan Line subsequently commenced the first entitled lawsuit on July 18, 1974, seeking a permanent injunction enjoining the federal defendants from enforcing the Commission's order.

NYK started its suit on September 20, 1974, asking for the same relief. Plaintiff Japan Line appropriately requested the convening of a three-judge court pursuant to 28 U.S.C. §§ 2325 and 2284. On September 30, 1974 the cases were found to be related pursuant to Local Rule 101 and ordered consolidated for hearing on November 14, 1974.

## ANALYSIS

We disagree with defendants' assertion that this court must confine itself to determining whether the Commission's decision is rationally supported by substantial evidence. The defendants' brief refers to the Commission's efforts in these cases as an "assertion of jurisdiction".[3] The Supreme Court has held that an administrative agency fixes the limits of its own jurisdiction subject to review by this court:

".  .  . An agency may not finally decide the limits of its statutory power. That is a judicial function."[4] (Footnote omitted)

■■ We do not find that the defendant Interstate Commerce Commission has correctly interpreted part IV of the Interstate Commerce Act, and therefore we are not bound to limit ourselves to an evidentiary review of the Commission's decision.[5] Furthermore, because here the ICC seeks to regulate Japanese steamship companies engaged in international trade, these cases raise problems transcending the particular specialization of that agency.[6] Viewed against

---

3. Brief for defendants at 17.

4. Social Security Board v. Nierotko, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946).

5. Id.

6. Part III of the Interstate Commerce Act gives the ICC power to control water carriers engaged in interstate commerce or movements in foreign commerce prior to transshipment for carriage to a foreign country. 49 U.S.C. § 902(i). Regulatory control of ocean transportation of property between the United States and a foreign country has been given to the Federal Maritime Commission. 46 U.S.C. §§ 801, 814, 817.

Generally it can be said that Congress has restricted the scope of the Federal Maritime Commission's power compared with the scope of the regulatory power granted to the ICC *because of an awareness that international commerce must be regulated in a somewhat different manner than domestic commerce.* See Note, Coordination of Intermodal Transportation, 69 Col.L.Rev. 247, 262–63 n. 88 (1969). For a discussion of the lesser rate regulation powers of the FMC as compared to the ICC see Note, Freight Forwarder, 76 Yale L.J. 1360, 1385 (1967).

this background these cases call for this court to undertake its own analysis of what activities Congress intended to reach under part IV of the Act.[7]

Briefly stated, the problem in these cases involves choosing whether to include or to exclude from ICC freight forwarder regulation international ocean carriers which happen to provide certain land based services advantageous to their customers in connection with their ocean carrier services. Congress has provided the following definition of "freight forwarder":

> "The term 'freight forwarder' means any person which (otherwise than as a carrier subject to chapters 1, 8, or 12 of this title) holds itself out to the general public as a common carrier to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes for the whole or any part of the transportation of such shipments, the services of a carrier or carriers subject to chapters 1, 8, or 12 of this title." [8]

■ The definitional elements of "freight forwarder" are set forth in 49 U.S.C. § 1002(a)(5) in the conjunctive, therefore all of them must be present before freight forwarder status can be found.[9] The necessary elements of freight forwarder status can conveniently be classified as follows:

(1) A holding out to the general public as a common carrier (other than one subject to part I, II or III of the Act) to transport or provide transportation of property, for compensation, in interstate commerce;

(2) Assembly and consolidation, or provision therefor;

(3) Performance of break-bulk and distribution, or provision therefor;

(4) Assumption of responsibility for the transportation from point of receipt to point of destination;

(5) Utilization of the services of a carrier subject to part I, II, or III of the Act.

Since we find for plaintiffs on the ground that the first definitional element is lacking, we do not decide whether each of the remaining four elements is present in these cases. In this opinion we focus on the lack of "compensation".

The Act fails to define the term "compensation". The Commission concluded that NYK and Japan Line were compensated, albeit "indirectly", for their USIT and FAK services by acquiring an increased volume of shipments for ocean carriage and operational savings.[10] The Commission further stated—without explanation—that this increase in patronage and operational savings could be quantified as a specific profit figure.[11] In short, the Commission determined that Congress intended to regulate those whose *only* reward for providing freight forwarding services is increased patron-

---

7. *See* 4 Davis, Administrative Law, § 30.09 at 241 (1958).

8. 49 U.S.C. § 1002(a)(5).

9. This is the accepted construction given by the ICC and the courts. *See,* e. g., National Motor Freight Traffic Assocn. v. United States, 323 I.C.C. 560, 572 (1963), aff'd. 242 F.Supp. 601 (D.D.C.1965); Columbia Ship-

pers and Receivers Assocn. Inc. v. United States, 301 F.Supp. 310, 323 (D.Del.1969). It is the construction which Congress intended. See H.R.Rep. 1172, 77th Cong., 1st Sess, pp. 5–6 (1941).

10. 344 I.C.C. 246, 267 (1973).

11. Id.

age and operational savings for their underlying carrier business. We disagree.

Whether the term "compensation" includes increased patronage and/or operational savings must be answered primarily from the history, terms, and purposes of part IV of the Act.[12] "Compensation" is not treated by Congress as a word of art having a definite meaning. On the other hand, Congress wrote part IV of the Act, including the definition of a "freight forwarder", not on a clear slate, but as a culmination of its study and consideration of the freight forwarding industry.[13]

The court has not found, nor has there been brought to its attention, a single incident in the legislative history of part IV of the Act in which Congress indicated that a freight forwarder's compensation encompasses increased patronage or operational savings. The legislative history does, however, indicate that Congress intended "compensation" to mean a bargained for reward for performance of freight forwarder services.

The Congressional report accompanying the bill which eventually became part IV of the Act[14] refers[15] to the comprehensive investigation of the freight forwarding industry filed by the Interstate Commerce Commission.[16] Therein the Commission recommended passage of federal legislation to solve "the problems which have arisen by reason of the forwarder."[17] One of the problems with which the Commission was at that time concerned, was the fact that, although forwarders published elaborate schedules of rates, they were not required by law to adhere to them, and it appeared that forwarders were not infrequently departing from their published schedules in order to secure the traffic of a particular shipper:[18]

"The three large forwarders compiled schedules effective April 1, 1936, naming rates for the transportation of freight between numerous points in the United States. It appears that such rates are now generally adhered to, but on many occasions prior to April 1, 1936, rates lower than their regular schedules were quoted to large shippers and special concessions were made to hold competitive traffic. As illustrative, National formerly published a rate of $1.21 on printing ink in metal cans from New York to Chicago, but a rate of 85 cents was quoted to two shippers because of competition with another forwarder. Due to truck competition, a rate of $2.62 on electric controllers from Cleveland to Houston, Tex., was quoted by National to the Electric Controller & Manufacturing Company in lieu of the published rate of $2.92."[19]

Consequently the Commission urged Congress to enact legislation regulating freight forwarders in order to curb "unreasonable, unjustly discriminatory, and unduly prejudicial and preferential rates and charges."[20] The Commission recommended that Congress require that rates and charges of freight forwarders must be filed with a federal authority and strictly enforced.[21]

These circumstances elucidate the use by Congress of the phrase "for compensation" in 49 U.S.C. § 1002(a)(5). It is reasonable to conclude, as this court does after examining the above mentioned ICC investigative report, that Congress intended to regu-

12. Cf. NLRB v. Hearst Publications, 322 U.S. 111, 122, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).

13. E. g., House Comm. on Interstate and Foreign Commerce, Report to Accompany S. 210, H.R.Rep.No.1172, 77th Cong., 1st Sess. (1941).

14. Id.

15. Id. at p. 3.

16. Freight Forwarding Investigation, 229 I.C.C. 201 (1938).

17. Id. at 303.

18. Id. at 298.

19. Id. at 211.

20. Id. at 304.

21. Id. at 303.

late only those who provide freight forwarding services where some mutual consideration in the nature of a *quid pro quo* passes between the parties to the forwarding agreement. We hold that Congress enacted part IV of the Act in order to supervise, among other things, the bargaining practices of freight forwarders so that discriminations for or against particular shippers could be eliminated. And we hold that "compensation", as used in 49 U.S.C. § 1002(a)(5), means the reward for which a forwarder bargains.[22]

■ In these cases we find there is no evidence, much less substantial evidence, that plaintiffs bargain for anything in return for providing forwarder services. Even if plaintiffs receive operational savings as a result of their USIT and FAK services, it has not been shown that plaintiffs in any way bargain with shippers for such savings. Similarly there is a complete lack of evidence indicating that plaintiffs require, bargain for, or seek promises of further patronage from shippers in return for providing the forwarding services here in question. Therefore, since plaintiffs provide freight forwarder type services to all of their customers without bargaining for any reward, they cannot discriminate between shippers and a critical need for regulating them evaporates. More importantly, plaintiffs receive no compensation, as this court has interpreted that term, and are not subject to part IV of the Act.

Again, we conclude that Japan Line and NYK receive no compensation, as that term is used in 49 U.S.C. § 1002(a)(5), and, therefore, are not subject to part IV of the Act.

By offering USIT and FAK services, NYK and Japan Line hope to fill a basic need of shippers who rely on intermodal transportation service. We feel that it is natural that the question of federal regulation should arise in this context. After careful consideration of the parties' arguments, we have concluded that federal regulation is not called for in these cases for the reasons set forth above. In closing we note that plaintiffs' services will provide a vital improvement to intermodal transportation service without any added expense to shippers and that not burdening plaintiffs with the complexities of regulation by two separate federal agencies advances the Supreme Court's determination that "encouragement of [intermodal] coordination is in the public interests." [23]

Therefore, it is the order of this court that defendant Interstate Commerce Commission's report and order in these cases, 344 I.C.C. 201 (1973), be and hereby is set aside, and that defendants be and hereby are permanently enjoined from prohibiting plaintiffs' USIT and FAK services on the ground that plaintiffs are conducting a freight forwarding service without an appropriate freight forwarder's permit from the ICC.

---

22. Congress and the Commission have consistently referred to the reward which forwarders bargain for as being in the nature of direct charges for rendering forwarding services. See 87 Cong.Rec. 8212, 8216 (1941); 44 I.C.C.Ann.Rep. 81 (1930); Ex Parte 260, Investigation Into the Status of Freight Forwarders, 339 I.C.C. 711, 713 (1971); Freight Forwarding Investigation, 229 I.C.C. 201, 209 (1938).

23. American Trucking Associations, Inc. v. Atchison, T. & S. F. Ry., 387 U.S. 397, 422, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967), *quoting* Substituted Service—Charges and Practices of For-Hire Carriers and Freight Forwarders. 322 I.C.C. 301, 330 (1964).