**JSP AGENCY, INC., Plaintiff-Appellant,**

v.

**AMERICAN SUGAR REFINING CO. OF NEW YORK, Amstar Corp., Northern Lines, Inc., Athenian Shipping Corp., Caribbean Charterers & Operators, Ltd., Ambrit Sugars, Inc., C. Czarnikow, Inc., Czarnikow-Rionda Company, Inc., B.W. Dyer & Company, Farr Mann & Co., Inc., M. Golodetz & Co., Inc., Lonray, Inc., Amerop, Division of Westway Trading Corporation, Woodhouse, Drake & Carey, Inc., Florida Sugar Marketing and Terminal Association, Inc., Hogan & Company, Inc., Philippine Sugar Trading Corp., Subsidiary of National Sugar Trading Association, Marc Rich & Co., Sugar Ltd. and Allied Towing Corporation, Subsidiary of Allied Marine Industries, Defendants-Appellees.**

No. 355, Docket 84–7611.

United States Court of Appeals, Second Circuit.

Argued Oct. 15, 1984.

Decided Jan. 11, 1985.

---

Peter C. Lambos, New York City (Lambos, Flynn, Nyland & Giardino, New York City, of counsel), for plaintiff-appellant.

William A. Sullivan, New York City (James M. Kenny, McHugh, Leonard & O'Conor, New York City, of counsel), for defendants-appellees Ambrit Sugars, Inc., C. Czarnikow, Inc., Czarnikow-Rionda Co., Inc., M. Golodetz & Co., Inc., Lonray, Inc., Amerop, Div. of Westway Trading Corp., Florida Sugar Marketing and Terminal Ass'n, Inc., Hogan & Co., Inc. and Allied Towing Corp., Subsidiary of Allied Marine Industries.

Mel P. Barkan, New York City (Steven R. Uffner, Brauner, Baron, Rosenzweig, Kligler, Sparber & Bauman, New York City, of counsel), for defendants-appellees Northern Lines, Inc., Farr Mann & Co., Inc. and Philippine Sugar Trading Corp., Subsidiary of Nat. Sugar Trading Ass'n.

Thomas L. Rohrer, New York City (George M. Leing, Healy & Baillie, New York City, of counsel), for defendants-appellees Amstar Corp. and American Sugar Refining Co. of New York, Inc.

Before OAKES, VAN GRAAFEILAND, Circuit Judges, and TENNEY, Senior District Judge.*

TENNEY, District Judge.

The JSP Agency appeals from a judgment of the United States District Court for the Southern District of New York, Whitman Knapp, *Judge,* granting summary judgment in favor of the defendants.[1] This appeal requires us to determine two issues —first, whether non-consenting, non-signatory parties may be bound by the terms of an agreement, merely because that agreement has been approved by the Federal Maritime Commission ("FMC") under Section 15 of the Shipping Act, 46 U.S.C. § 814 (1982) ("§ 814"),[2] and second, whether the

---

* Of the Southern District of New York, sitting by designation.

1. *See JSP Agency, Inc. v. American Sugar Refining Co.,* 589 F.Supp. 612 (S.D.N.Y.1984).

2. Section 814 provides in pertinent part:

Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term "agreement" in this section includes understandings, conferences, and other arrangements, but does not include maritime labor agreements or any provisions of such agreements, unless such provisions provide for an assessment agreement described [below].

The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations.

. . . . .

agreement in question was adopted by one of the appellees as a result of the conduct, long-term practice, or cooperation of that appellee.

For the reasons stated below, we answer both questions in the negative, and affirm the decision of the district court.

BACKGROUND

The undisputed facts establish that the following events occurred. In 1977, after two months of striking, the International Longshoremen's Association ("ILA") entered into a labor agreement—the Job Security Program Agreement, also known as the JSP Agreement ("Agreement")—with a group of approximately 200 carriers. The Agreement provided that the signatory carriers would pay a tonnage assessment on cargo loaded or unloaded by ILA labor in specified ports. It was agreed that the assessments would be placed in a central fund and would be used to guarantee certain benefits for ILA members. The Agreement was approved by the FMC pursuant to § 814. The JSP Agency, the plaintiff-appellant in this action, was established to administer the fund created by the Agreement.

Subsequent to the signing of the Agreement, a separate document, known as the Master Contract, was signed by the ILA and the New York Shipping Association ("NYSA").[3] NYSA is a multi-employer bargaining unit representing management. Its members include carriers, stevedores, terminal operators and other groups generally employing ILA labor in handling cargo. The Master Contract, which ultimately ended the strike, was negotiated and signed independently of the JSP Agreement. The district court found that the JSP Agreement had been appended to the Master Contract, but had not been absorbed by or incorporated as part of the Master Contract.

Because the JSP Agency had difficulty collecting assessments from the signatory carriers, the Agreement was amended in 1982 ("Amendment"). The Amendment was signed by the ILA, on behalf of its members, and by the JSP Agency on behalf of the carriers that had previously signed the Agreement.

The 1982 Amendment is the basis of the case at bar. It mandates that all carriers using ILA labor must subscribe to the JSP Agreement and that New York terminal operators and stevedores must obtain subscription agreements from the carriers with whom they deal. The Amendment also provides that the terminal operators and stevedores are jointly liable for tonnage assessments due on cargo if they provide services to a carrier and fail to obtain the carrier's subscription. The Amendment states in relevant part:

Every stevedore and terminal operator employing ILA labor subject to the JSP Agreement shall first procure a Subscription Agreement from the Carrier re-

---

Any agreement and any modification or cancellation of any agreement not approved, or disapproved, by the Commission shall be unlawful, and agreements, modifications, and cancellations shall be lawful only when and as long as approved by the Commission; before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation ....

Assessment agreements, whether part of a collective bargaining agreement or negotiated separately, to the extent they provide for the funding of collectively bargained fringe benefit obligations on other than a uniform man-hour basis, regardless of the cargo handled or type of vessel or equipment utilized, shall be deemed approved upon filing with the Commission....

Every agreement, modification, or cancellation lawful under this section, or permitted under section 813a of this title, shall be excepted from the provisions of the Act approved July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," and amendments and Acts supplementary thereto, and the provisions of sections 73 to 77, both inclusive, of the Act approved August 27, 1894, entitled "An act to reduce taxation, to provide revenue for the Government, and for other purposes," and amendments and Acts supplementary thereto.

3. In negotiating the Master Contract, the employers were represented by a group of six multi-employer associations from around the country, one of which was NYSA. Only NYSA's involvement, however, is relevant in the case at bar.

questing the services of ILA labor in the loading or unloading of its vessel(s).

\* \* \* \* \* \*

Stevedores and terminal operators who fail to get such Subscription Agreement from Carriers utilizing ILA labor in the ports subject to the JSP Agreement shall be jointly liable with the non-subscribing Carrier for the amount of any unpaid JSP Tonnage Assessment. Such Subscription Agreement shall not be necessary where the Carrier has directly subscribed to the Master [Contract] and the JSP Agreement.

The Amendment was also submitted to the FMC and was approved pursuant to § 814.

Based on the 1982 Amendment, the JSP Agency brought this action against the defendants-appellees to collect tonnage assessments on bulk raw sugar that was purchased by the appellee Amstar Corporation and was unloaded by the appellee American Sugar Refining Company of New York, Inc. ("American Sugar"), a stevedoring company.[4] The sugar was transported to the United States on vessels that were owned, chartered or operated by the other appellees in this case.[5] None of the appellees was a signatory to the JSP Agreement, nor did any submit subscription agreements.

The appellant contends on appeal, as it did below, that because the FMC approved the JSP Agreement and its Amendment, the appellees are jointly liable for unpaid tonnage assessments. The appellant also argues that American Sugar—as a member of NYSA—is liable because the JSP Agreement was absorbed by the Master Contract which was signed by NYSA or, alternatively, because NYSA adopted the JSP Agreement and its Amendment.

**4.** American Sugar is a member of NYSA and is a wholly-owned subsidiary of Amstar Corporation.

**5.** The appellees had various contractual arrangements concerning the allocation of stevedoring charges. Under a contract providing for delivery on a "free in, free out" basis, for example, the stevedoring costs were to be paid by the

On cross-motions for summary judgment, the district court rejected these arguments and granted summary judgment in favor of the appellees.

### DISCUSSION

A motion for summary judgment may be granted only if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see generally* 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 56.15[1.–0] (2d ed. 1983). The party moving for summary judgment must show that there are no material facts in dispute. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444 (2d Cir.1980). Summary judgment, however, will not be denied merely because of conclusory allegations or denials made by the opposing party. *See Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983) (citing cases). Concrete particulars must be set forth in opposition to the motion. *See SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978). We conclude that there are no genuine issues of material fact, and that the defendants were entitled to judgment as a matter of law.

### A. The Effect of FMC Approval

Section 814 provides that agreements which receive FMC approval are "lawful." The appellant argues that because an approved agreement is lawful, it has the "force of law," and therefore all parties affected by the terms of that agreement are bound by those terms, as a matter of law. Applying this rationale, the appellant contends that FMC approval of the JSP Agreement and its Amendment made them

charterer. Based on these various agreements, JSP claims that the appellees are jointly and severally liable for the tonnage assessments at issue. In view of our decision here, it is not necessary to address the question of how liability would have been allocated among the appellees.

binding on the appellees in this case as a matter of law. The district court rejected this argument and held that FMC approval "does no more than provide antitrust immunity." [6] We agree with the lower court.

■ Section 814 permits common carriers to enter into certain agreements, such as tonnage assessment agreements, despite the fact that the agreements may be anti-competitive in nature. Absent this statute, such agreements could be challenged as being unlawful under the antitrust laws. "An agreement filed with and approved by the Commission is immunized from challenge under the antitrust laws." *Volkswagenwerk Aktiengesellschaft v. FMC*, 390 U.S. 261, 271, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).

■ A careful reading of § 814 makes it clear that the statute's sole purpose is to provide antitrust immunity to certain maritime agreements. This is apparent from the type of agreement that must be filed, the kind of responsibility given to the FMC by the statute, and the particular result of FMC approval set forth in § 814. Nothing in the statute itself supports the appellant's argument that § 814 provides a method of imposing contractual obligations on non-consenting parties.

Under § 814, common carriers must obtain FMC approval of agreements "fixing or regulating transportation rates or fares; ... [giving] special privileges or advantages; controlling, regulating, preventing, or destroying competition; ... or in any manner providing for an exclusive, preferential, or cooperative working arrangement." Thus it can be seen that this statute does not apply to agreements in general, but rather, is directed towards those agreements that would be unlawful under the antitrust laws. *See Isbrandtsen Co., Inc. v. United States*, 211 F.2d 51, 57 (D.C. Cir.), *cert. denied sub nom. Japan-Atlan-*

tic & Gulf Conference v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954) ("[T]he Shipping Act specifically provides machinery for legalizing that which would otherwise be illegal under the antitrust laws."); *accord Mediterranean Pools Investigation*, 9 F.M.C. 264 (1966) (The Commission stated that it is "[o]f prime importance ... [to recognize] that section 15 represents a departure from our national policy—the promotion of competition ... embodied in the Antitrust Laws, 15 U.S.C. sections 1 *et seq.* Agreements approved under section 15 of the Shipping Act are exempted from the provisions of the antitrust laws.").[7]

The kind of authority delegated to the FMC also indicates that the purpose of the statute is a narrow one, limited to antitrust questions, rather than a broad one that alters the well-established rules concerning contractual obligations. Section 814 directs that "[t]he Commission shall ... disapprove, cancel or modify any agreement ... that it finds to be unjustly discriminatory or unfair ... or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest ...."

The Commission is thus charged with the duty of balancing the benefits of cooperative maritime agreements against the harm such agreements could inflict on competition, commerce or the public interest. Although this type of determination is ordinarily made under the provisions of the antitrust laws, § 814 specifically shifts responsibility for evaluating covered maritime agreements to the FMC. *See Volkswagenwerk*, 390 U.S. at 273–74, 88 S.Ct. at 936–37 ("[T]he Commission is required under § 15 to consider antitrust implications." (citations omitted)).

Finally, and perhaps more significantly, the statute states, in unambiguous terms, exactly what effect FMC approval has on

---

6. 589 F.Supp. at 616.

7. It should be noted that "[t]he construction put on a statute by the agency charged with administering it is entitled to deference by the courts, and ordinarily that construction will be af-

firmed if it has a 'reasonable basis in law.'" *Volkswagenwerk*, 390 U.S. at 272, 88 S.Ct. at 935 (quoting *NLRB v. Hearst Publications*, 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944)).

an agreement. Section 814 provides that approved agreements are lawful[8] and "[e]very agreement ... lawful under this section ... shall be excepted from the provisions of the [Sherman Antitrust] Act ... and amendments and Acts supplementary thereto ...." Thus, the result of FMC approval—as specifically set forth in the statute—is antitrust immunity for approved agreements. There is no indication that the statute was intended to enlarge the scope of an agreement, so that nonconsenting parties could be bound by the terms of an agreement once it was approved. *See Port of Tacoma v. S.S. Duval,* 364 F.2d 615, 617 (9th Cir.1966) ("[S]ection 814 does not purport ... to make [an agreement's] filing equivalent to constructive notice of [its] contents to the world at large. It confers exemption from the antitrust laws, if the Commission approves [the agreement].").[9]

It is clear from the contents and structure of the statute, and the context within which the word "lawful" is used in § 814, that an agreement approved under § 814 has been deemed lawful in the limited sense that the agreement has been exempted from the antitrust laws. Thus, the appellant is incorrect in construing the statute to mean that an agreement approved under § 814 has the force of law in the sense that it binds all parties named in the agreement, even non-signatories, as a matter of law.

The appellant erroneously relies on two cases, *In re Primary Indus. Corp.,* No. 83 Civ. 3883 (RWS) (S.D.N.Y. Sept. 29, 1983), and *NYSA v. Retla Steamship Co.,* 47 A.D.2d 825, 365 N.Y.S.2d 550 (1st Dep't), *appeal dismissed,* 36 N.Y.2d 870, 370 N.Y.

S.2d 925, 331 N.E.2d 700 (1975), as providing support for the argument that FMC approval under § 814 results in non-consenting parties being bound by the terms of an approved agreement. An examination of the facts presented in those cases makes it clear that the cases do not stand for the proposition for which they are cited.

In *Retla* and *Primary,* the ILA sought to collect tonnage assessments from carriers that had done business with certain NYSA members. NYSA had entered into a labor agreement with the ILA, in which NYSA agreed that its stevedore and terminal operator members would collect tonnage assessment subscriptions from all carriers with whom they did business. Although the facts in the cases cited appear similar to the facts in the case at bar, there are several crucial differences concerning the liability of NYSA members, as well as the liability of the carriers, which negate the appellant's argument that such liability resulted from FMC approval.

In *Retla* and *Primary,* NYSA *agreed* that its stevedore and terminal operator members would either obtain assessment subscriptions or pay the assessments owed. The liability of NYSA members, therefore, was based on NYSA's agreement with the ILA; liability was *not* based on FMC approval.[10]

The liability of the carriers in *Retla* and *Primary* was also derived from the carriers' own agreement to pay assessments, rather than from FMC approval. Because NYSA had agreed that its members would collect assessment subscriptions, NYSA members provided services—such as loading or unloading cargo—to the defendant carriers on the *condition* that the carriers

---

**8.** Section 814 also provides that agreements that are covered by this statute and are not approved by the Commission are "unlawful."

**9.** *Accord Inter-American Freight Conference—Cargo Pooling Agreements,* 14 F.M.C. 58, 60–62 (1970) (The FMC declined jurisdiction, holding that because the proposed arrangement had not been consented to by all the requisite parties, no "agreement" existed within the meaning of the statute.); *Hong Kong Tonnage Ceiling Agreement,* 10 F.M.C. 134, 141 (1966) (same).

**10.** In the case at bar, the district court found, and we agree, *see* discussion *infra,* that NYSA had not subscribed to the JSP Agreement or its Amendment. Thus, the instant case differs from *Retla* and *Primary* because, here, NYSA did not agree that its members would collect tonnage assessments for the JSP fund or pay the amount owed. Lacking an agreement such as those existing in *Retla* and *Primary,* there is no liability.

would agree to pay tonnage assessments.[11] In the cases cited, the carriers were presented with a choice: they could accept the services of NYSA's members and pay the assessments, or they could refuse the proffered services and avoid any obligation for assessments.[12] By accepting the services offered, the carriers consented to pay the assessments in question.

Since each of the parties in *Retla* and *Primary* agreed to accept certain obligations, those cases simply stand for the time-honored rule that parties who enter into an agreement are bound by the terms of that agreement. Neither case provides support for the proposition that FMC approval does more than provide antitrust immunity for approved agreements.[13]

Thus, because of the clear language of the statute, and absent any authority to the contrary, we conclude that the district court was correct in holding that § 814 provides antitrust immunity to approved agreements, and no more.

### B. *The JSP Agreement and the Master Contract*

■ The appellant argues that the JSP Agreement was absorbed by the Master Contract, which was signed by NYSA, and therefore, as a NYSA member, American Sugar is bound by the terms of the JSP Agreement and its Amendment. It is undisputed that NYSA has the authority to bind its members. The crux of the problem, therefore, is whether NYSA did, in fact, bind its members to the JSP Agreement. It is clear from the record before the district court that the JSP Agreement was not absorbed by the Master Contract even though it was physically appended to it.

The Master Contract and the JSP Agreement were negotiated and signed separately. Indeed, the ILA began to negotiate directly with the group of carriers that ultimately signed the JSP Agreement only when negotiations with NYSA reached an impasse. Although the JSP Agency was established to administer the Agreement, the agency has no comparable functions concerning the Master Contract.

At oral argument in the court below, the attorney for the JSP Agency stated that the Agreement and the Master Contract are separate documents and that NYSA and its stevedore members are not parties to the JSP Agreement. Although the attorney for the JSP Agency stated that the Agreement is a "subsection" of the Master Contract, he specified that the Agreement pertained only to the signatory steamship carriers, and did not involve NYSA as an association or its stevedore and terminal operator members.

Thus, the record fully supports the lower court's conclusion that the Master Contract did not absorb the JSP Agreement, and that NYSA's subscription to the Master Contract, therefore, did not bind its members to the JSP Agreement.

### C. *Adoption of the JSP Agreement and its Amendment*

■ The appellant also contends that NYSA adopted the JSP Agreement and its Amendment, thereby binding its members.

---

**11.** In the instant case, American Sugar—a NYSA member—provided services to its customers without imposing any conditions concerning the JSP assessments. Although certain appellees in this case accepted American Sugar's services, they did so without consenting to pay the assessments at issue. Without such consent, there is no liability.

**12.** These cases provide an excellent example of the type of agreement that § 814 was designed to regulate. Under the facts in *Retla* and *Primary,* a carrier may have had little choice but to accept the terms presented by NYSA's members if the carrier wished to load or unload cargo in New York. Absent § 814, and FMC approval pursuant to that statute, such an arrangement could have been challenged as being in violation of the antitrust laws.

**13.** The district court read these two cases as providing support for JSP's argument, but declined to follow the cases. 589 F.Supp. at 616. As explained above, the defendants in *Retla* and *Primary* were obligated to pay assessments as a result of their own agreements, not as a result of FMC approval. Thus, the cases do not contradict the lower court's holding that FMC approval "does no more than provide antitrust immunity." *Id.*

No formal action, however, was ever taken by NYSA to adopt either the Agreement or the Amendment, and the documents submitted by the JSP Agency do not show that NYSA did, in fact, adopt either one.

At oral argument in the court below, the attorney for the JSP Agency stated that NYSA had passed a resolution which provided that its stevedore members would comply with the 1982 Amendment. Such a resolution, however, was never submitted to the district court, despite the court's explicit request. Absent such a resolution, the district court was correct in concluding that NYSA did not adopt the Agreement or the Amendment.

The appellant submits one last diversionary argument. In a 1977 memorandum, NYSA advised its members to cooperate with the JSP Agency by collecting carriers' subscriptions to the JSP Agreement, and many NYSA members did so. The appellant now argues that, by cooperating with the JSP Agency, NYSA and its members implicitly adopted the terms of the JSP Agreement. This argument is frivolous.

The mere fact that NYSA members cooperated in administering the JSP Agreement does not mean that they consented to being held jointly liable for tonnage assessments owed, or that they entered into a bargained-for agreement with the JSP Agency. Moreover, although NYSA did advise its members to cooperate in obtaining subscription agreements, clearly the memorandum circulated by NYSA was not intended to impose a legal obligation on NYSA's members.

The appellant also attempts to bolster its argument by pointing out that NYSA members had a long-standing local practice of collecting assessment subscriptions. There had, in fact, been a long-standing practice of this kind. NYSA members were, however, collecting subscriptions for assessments relating to a fringe-benefit fund established by a NYSA–ILA agreement, which had no connection to the JSP Agreement. The long-term practice was completely unrelated to the JSP fund. Thus, the appellant's arguments do not lead us to the conclusion that NYSA adopted the JSP Agreement.

CONCLUSION

In sum, there is no merit to any of the appellant's arguments. FMC approval of an agreement provides antitrust immunity, but does not bind non-consenting parties to the terms of the approved agreement; thus, the appellees in this case were not bound by the JSP Agreement or the Amendment despite FMC approval. Furthermore, NYSA members were not bound by the Agreement or the Amendment as a result of any action taken by NYSA. The JSP Agreement was not absorbed by the Master Contract, NYSA did not adopt the Agreement's terms either formally or by cooperating in its administration, and NYSA's long-standing practice of collecting assessment subscriptions was unrelated to the JSP Agreement.

The judgment of the district court granting summary judgment in favor of the appellees is therefore affirmed.