Lenora B. FULANI and Lenora
B. Fulani for President,
Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and The United States of
America, Respondents,

American Broadcasting Companies,
Inc., Intervenor.

No. 834, Docket 94–4100.

United States Court of Appeals,
Second Circuit.

Argued Jan. 12, 1995.

Decided March 16, 1995.

Arthur R. Block, New York City (Joseph Kelly, Atlanta, GA, of counsel), for petitioners.

Daniel M. Armstrong, Associate General Counsel, F.C.C. (William E. Kennard, General Counsel, Michael F. Finn, Counsel, C. Grey Pash, Jr., Counsel, Washington, DC, Anne K. Bingaman, Asst. Atty. Gen., Robert B. Nicholson, John P. Fonte, of counsel), for respondents F.C.C. and the U.S.

Before: KEARSE, McLAUGHLIN and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

This case concerns the "equal opportunities" or "equal time" requirement of the Communications Act of 1934. Under this provision, when a licensed broadcast station permits any "legally qualified candidate for any public office" to "use" a station, the licensee must provide all other legally qualified candidates with an equal opportunity to use its facilities. *See* 47 U.S.C. § 315(a) (1988). The Act exempts from the equal opportunity requirement four categories of "news" events, including "bona fide news interview[s]." *Id.* The issue before us is whether the Federal Communications Commission acted reasonably in exempting as a bona fide news interview a live appearance by Ross Perot on ABC.

In the late evening of June 29, 1992, ABC aired a special program entitled, "Who is Ross Perot?," which included a live appearance by Ross Perot—a then-undeclared independent candidate for President of the United States in the 1992 election—before a studio audience. Petitioner Lenora B. Fulani, another independent candidate for the presidency, filed a request for an equal opportunity to appear on ABC, pursuant to § 315(a). ABC denied Fulani's request. Subsequently, Fulani filed a complaint with the FCC.

In a letter ruling dated October 21, 1992, the FCC's Mass Media Bureau concluded that the "Who is Ross Perot?" telecast was exempt from the equal opportunity requirement as a "bona fide news interview." *Lenora B. Fulani*, 7 F.C.C.R. 6882 (MM Bur. 1992) ("*Mass Media Ruling* "). For a broadcast to qualify for this exemption, FCC case law requires that it be "regularly scheduled." *U.S. News and World Report, L.P.*, 2 F.C.C.R. 7101, 7102 (1987). The Mass Media Bureau found that "Who is Ross Perot?" met this requirement, because it was, in fact, an edition of ABC's "Nightline" series. *See Mass Media Ruling*, 7 F.C.C.R. at 6883.

On May 16, 1994, the FCC issued an opinion affirming the findings of the Mass Media Bureau and denying Fulani's "application for review." *Lenora B. Fulani*, 9 F.C.C.R. 2258 (1994) ("*Fulani* "). Pursuant to 47 U.S.C. § 402(a) (1988) Fulani now seeks review of this order. We hold that the FCC acted reasonably in finding that Fulani was not entitled to an equal opportunity, and thus we deny her petition for review.

## I

In the late spring and early summer of 1992, the American public was captivated by the possibility of Ross Perot's independent candidacy for President of the United States in the general election of Nov. 3, 1992.[1] At the height of the Perot arabesque, ABC put together a two-part package collectively entitled "Who is Ross Perot?," which aired the night of June 29, 1992, spilling into the early morning of June 30.

The first part of the telecast, which aired from 10 to 11 p.m. Eastern Standard Time, consisted of an edited documentary profile of Perot. The second part, which began at 11:30 p.m. and ran until 1:10 a.m., was broadcast live and carried the subtitle "National Town Meeting." During the live segment, Perot appeared in person before a studio audience in New York, with additional audience members in ABC studios across the nation electronically linked.[2]

ABC news anchor Peter Jennings hosted the live segment of the telecast, opening it by welcoming viewers to "a National Town Meeting with Ross Perot, undeclared candidate for president." Jennings explained the rationale for the "town meeting" format as follows:

> Earlier this evening, we devoted an hour to several episodes of Mr. Perot's career which, in our view, help us all to better understand who he is. He has developed something of a reputation for not thinking very much of the press inquiring into his past, suggesting on other occasions that we prevent him from having direct access to the voters. Well, tonight is a chance for him to interact with what we hope is a broad representation of his fellow citizens, who join us live, at our invitation, in 10 different cities.

*ABC News Special Show # ABC-37: Who is Ross Perot?* (ABC television broadcast, June 29, 1992) (transcript reprinted at J.A. 65-80) [hereinafter "Transcript"]. The town meeting consisted of a question-and-answer session, with audience members asking questions of Perot—questions that had been

---

**1.** Indeed, in early June 1992 some polls showed Perot leading both incumbent President George Bush and Democratic standard-bearer Bill Clinton, the eventual winner in 1992. *See, e.g.,* Richard Benedetto, *Poll Shows Perot, Bush Close; Clinton Third*, GANNETT NEWS SERVICE, June 16, 1992; *Perot the Front Runner*, TIME, June 15, 1992, at 32; *The 1992 Campaign: On the Trail;*

*Poll Gives Perot a Clear Lead*, N.Y. TIMES, June 15, 1992, at A18.

**2.** The locations of the remote studios included Ames, Iowa; Boston; Dallas; Little Rock; Los Angeles; Miami; Seattle; Washington, D.C.; and Ypsilanti, Michigan.

screened in advance by ABC,[3] and whose order had been predetermined by ABC's broadcast booth.

Prior to the audience questions, Jennings told Perot, "before our hour this evening, you did say that you might want to take a minute or so at the beginning of this program to respond to the hour we did on you in prime time, so be my guest." Transcript at 1. Perot proceeded to speak for approximately fifteen minutes, primarily about his family and his business, with Jennings interjecting occasionally to ask questions or ask for clarifications. *Id.* at 1–3.

Following Perot's response, Jennings began taking questions from the audience for Perot to answer. Altogether, Perot responded to twenty questions, on such topics as abortion rights, foreign investment in American baseball, homosexuals in the military, and Perot's alleged penchant for investigating people. *Id.* at 3–14. Although most of these questions had been preselected by ABC, and the questioners called on by Jennings, at one point an audience member who had not been called on interjected with an accusation that Perot was biased against homosexuals, to which Jennings allowed Perot to respond. *Id.* at 5.

One week after the airing of "Who is Ross Perot?," on July 6, ABC received a letter from the Fulani presidential campaign requesting an equal opportunity to use ABC's broadcast facilities pursuant to Section 315(a). Copies of the letter were transmitted to all the ABC affiliates that broadcast into the eight states in which Fulani had qualified for the presidential ballot.

On July 9, 1992, ABC rejected Fulani's request to appear on ABC, on the grounds that "Who is Ross Perot?" was exempt from the equal opportunity requirement as a "bona fide news interview" under § 315(a)(2).[4] All the ABC affiliates of which Fulani had requested an equal opportunity also declined her request.

More than two months after ABC's denial of Fulani's equal opportunity request, Fulani filed a complaint with the FCC. The complaint, dated September 11, 1992, alleged that the live segment of "Who is Ross Perot?" did not meet the requirements for the "bona fide news interview" exemption, because it was a one-time news special rather than an edition of a "regularly scheduled" series.

The FCC's Mass Media Bureau, acting pursuant to its delegated authority, denied Fulani's complaint in a letter ruling of October 21, 1992. The Bureau found that "Who is Ross Perot?" met the criteria for the § 315(a)(2) "bona fide news interview" exemption—criteria established by FCC precedent. *See U.S. News,* 2 F.C.C.R. 7101. Among these criteria, the one most vigorously contested was the requirement that an exempted news interview be "regularly scheduled." *See id.* at 7102. ABC argued, and the Mass Media Bureau agreed, that "Who is Ross Perot?" met this requirement because it was "part of a regularly scheduled news interview program which typically carries the 'Nightline' title." *Mass Media Ruling,* 7 F.C.C.R. at 6882. The live segment of the Ross Perot telecast occupied the time slot—from 11:30 p.m. to midnight—usually filled by "Nightline." However, as Fulani pointed out, "Who is Ross Perot?" ran well beyond midnight; in addition, the "Nightline" name and moniker were not used at any time during the Ross Perot telecast, and the regular host of "Nightline," Ted Koppel, did not appear. Pet'r Br. at 7. Nonetheless, the Bureau found that inasmuch as ABC had repeatedly incorporated the "town meeting"

---

**3.** At the outset of the show, Jennings said: "Neither Mr. Perot nor I know what [the questions] are, which means, sir, that you [Perot] are vastly better prepared for this evening than I am." Transcript at 1. ABC subsequently explained that while its producers did, in fact, preselect all questions, Jennings deliberately chose not to be briefed on the substance of the questions "in order to enhance the spontaneity" of the proceedings. Letter from Sam Antar, Vice President of the ABC Legal Department, to Arthur R. Block, counsel to Fulani 2 (July 9, 1992), *in* J.A. 92.

**4.** ABC argued in the alternative that the Ross Perot telecast was exempt as "on-the-spot coverage of [a] bona fide news event[]" under § 315(a)(4). Inasmuch as the FCC agreed with ABC that the telecast was exempt under § 315(a)(2), it never reached the argument concerning § 315(a)(4).

format into the "Nightline" series, the inconsistencies between "Who is Ross Perot?" and "Nightline" alleged by Fulani were insufficient to defeat the exemption. *Mass Media Ruling,* 7 F.C.C.R. at 6883.

On November 18, 1992, Fulani submitted to the FCC an Application for Review. In a Memorandum Opinion and Order dated May 16, 1994, the FCC denied Fulani's application and thereby affirmed the Bureau's decision. *See Fulani,* 9 F.C.C.R. at 2260. In its opinion, the Commission found no error in the Bureau's disposition of the arguments before the Bureau, and further found that new arguments raised for the first time before the Commission provided no basis for disturbing the determinations of the Bureau. *See id.* at 2259. Finally, the Commission refused Fulani's request for an evidentiary hearing. *See id.* at 2260.

Pursuant to 47 U.S.C. § 402(a), Fulani now seeks review of the order of the FCC. This case presents two questions: (1) whether the FCC erred in exempting ABC's "Who is Ross Perot?" from the equal opportunity requirement as a "bona fide news interview," and (2) whether the FCC erred in denying Fulani's request to conduct an evidentiary hearing.

## II

### A

■ The first question this case raises is whether the FCC erred in its construction of the "bona fide news interview" exemption from the equal opportunity provision. In reviewing an FCC interpretation of a statute, we must determine whether the construction proffered by the Commission is "arbitrary,

capricious, or lacking in any rational basis." *Capital Tel. Co. v. FCC,* 777 F.2d 868, 869 (2d Cir.1985) (per curiam). We note at the outset that the general standard of review to be applied in connection with final orders of the FCC is a "highly deferential one," *id.* at 870; this standard of review frames our inquiry.

### B

Section 315(a) of the Communications Act of 1934—commonly known as the "equal opportunity" or "equal time" provision—requires that when a licensed television or radio station "permit[s] any ... legally qualified candidate for any public office to use a broadcasting station," the licensee "shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station." 47 U.S.C. § 315(a) (1988).

■ In 1959, Congress amended Section 315(a) to exempt four categories of broadcast materials from the statutory equal opportunity requirements:[5]

(1) bona fide newscast[s],

(2) bona fide news interview[s],

(3) bona fide news documentar[ies] (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or

(4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto).

Pub.L. No. 86–274, § 1, 73 Stat. 557 (1959) (*amending* 47 U.S.C. § 315). The relevant legislative history suggests that Congress de-

---

5. The spur for Congress's amending Section 315(a) was the FCC's 1959 ruling that news coverage of Chicago Mayor Richard J. Daley's performance of his official duties compelled the granting of equal time to challenger Lar Daly. *In re Telegram to CBS, Inc. (Lar Daly),* 18 Rad. Reg. (P & F) 238, *recon. denied,* 26 F.C.C. 715 (1959). "Congress' central concern in taking action was to overrule the Commission's *Lar Daly* decision. This concern was so important and so immediate that Congress was unwilling even to wait for that decision to be considered by the courts on appeal." *Branch v. FCC,* 824 F.2d 37, 43 (D.C.Cir.1987), *cert. denied,* 485 U.S. 959,

108 S.Ct. 1220, 99 L.Ed.2d 421 (1988) (citations omitted). Indeed, the granting of equal time to Daly "created a national furor." *Aspen Institute,* 55 F.C.C.2d 697, 698 (1975).

Lar Daly was a perennial candidate for office. Campaigning in an Uncle Sam costume and using the nickname "America First" in many of the ballots on which he appeared, Daly ran unsuccessfully for more than 40 elections until his death in 1978. *See* David Fremon, *Campaign tales: All over Chicago, speaks of the city's unconventional political wisdom,* CHI. TRIB., July 10, 1992, at 6.

liberately set forth broad categories of exemption, delegating to the FCC "full flexibility and complete discretion to examine the facts in each complaint" and to make a determination based "on the facts submitted in each case." S.REP. NO. 562, 86th Cong., 1st Sess. 12 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2564, 2574. The statute vests in the FCC authority to "prescribe appropriate rules and regulations to carry out the provisions of" the equal opportunity requirement. 47 U.S.C. § 315(d). This explicit delegation for the equal time provision in particular constitutes "something more than the normal grant of authority permitting an agency to make ordinary rules and regulations," *Chisholm v. F.C.C.*, 538 F.2d 349, 357 (D.C.Cir.), *cert. denied*, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976), and counsels exceptional deference to FCC dispositions of equal opportunity claims. With this deference in mind, we turn to an examination of the Commission's finding that ABC's Ross Perot telecast met the requirements for the Section 315(a)(2) "bona fide news interview" exemption to the equal opportunity requirement.

### C

As noted above, Congress delegated to the FCC broad authority to "prescribe appropriate rules and regulations" to implement the legislative policies undergirding the statutory exemption categories. 47 U.S.C. § 315(d). With regard to the bona fide news interview exemption, the Conference Report on the adoption of the exemption sets forth the legislative intent behind § 315(a)(2) as follows:

> It is intended that in order for a news interview to be considered "bona fide" the content and format thereof, and the participants, must be determined ... by the network in the case of a news interview originating with a network; and the determination must have been made by the station or network, as the case may be, in the exercise of its "bona fide" news judg-

ment and not for the political advantage of the candidate for public office.

H.R.CONF.REP. No. 1069, 86th Cong., 1st Sess. 4 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2583.

The FCC subsequently adopted in its case law the criteria suggested in the legislative history, prescribing three requirements that a broadcast must meet to qualify for a § 315(a)(2) exemption as a bona fide news interview. *First*, the program must be "regularly scheduled." *U.S. News*, 2 F.C.C.R. at 7102; *Political Primer*, 100 F.C.C.2d 1476, 1496 (1984). *Second*, the broadcaster must have "control" over the program. *U.S. News*, 2 F.C.C.R. at 7102. *Third*, the broadcaster's decisions regarding "format, content and participants [must be] based on his reasonable, good faith journalistic judgment rather than on an intention to advance the candidacy of a particular person." *Political Primer*, 100 F.C.C.2d at 1496.[6] Fulani does not challenge the validity of these criteria, but rather their application by the FCC in this case.

### 1. "Regularly Scheduled"

The central dispute between Fulani and the FCC is whether the Commission's finding that "Who is Ross Perot?" met the "regularly scheduled" test was arbitrary and capricious. Fulani first argues that the FCC's conclusions create an unprecedented exemption for what she calls "time blocks," allegedly in violation of the clear statutory purpose. Second, she argues that the FCC abused its discretion in holding that "Who is Ross Perot?" and "Nightline" were one and the same. To this end, she points out several disparities between the Ross Perot telecast and the usual format of "Nightline": (1) the word "Nightline" never appeared on the broadcast; (2) the usual host of "Nightline," Ted Koppel, did not appear; (3) the live segment of the Perot broadcast ran for approximately 100

---

**6.** In *Political Primer*, the FCC listed two additional factors to be considered in connection with § 315(a)(2) exemptions: "How long [the program] has been broadcast," and "[W]hether selection of persons to be interviewed and topics to be discussed are based on their newsworthiness." 100 F.C.C.2d at 1496. Most of the cases,

however, focus primarily on the three criteria listed above—"regularly scheduled," "control," and "good faith journalistic judgment"—presumably because they largely incorporate the two factors listed here. The FCC discussed only these three criteria, and Fulani does not raise the additional two in her petition for review.

minutes, far more than the 30 minutes usually allotted to "Nightline"; and (4) the "town meeting" format employed by "Who is Ross Perot?" had never been used by "Nightline" in connection with a political candidate's appearance.

■ An agency's construction of a statute is subject to the two-prong test set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under the *Chevron* framework, the initial question is "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. at 2781. If congressional intent is "clear," both the court and the agency "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781–82. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782.

The issue of whether a telecast with the characteristics of "Who is Ross Perot?" falls within Congress' intent in adopting the news interview exemption from the equal opportunities requirement is one to which Congress has not "directly spoken." On this score, both the statute and the relevant legislative history are "silent or ambiguous." *Id.* The "regularly scheduled" requirement is itself derived from the legislative history, but those materials do not compel any particular interpretation of the requirement by the FCC.[7] *See Telecommunications Research and Action Ctr. v. FCC,* 26 F.3d 185, 189 (D.C.Cir. 1994) ("Congress explicitly chose *not* to legislate in detail, and opted for exemptions based on general categories relating to news coverage, rather than on specific program formats.") (internal quotation marks omitted) (emphasis in original). Hence, the question

before us is whether the FCC's construction of the "regularly scheduled" requirement of Section 315(a)(2) was "permissible." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782; *Detsel v. Sullivan,* 895 F.2d 58, 62 (2d Cir. 1990).

■ So long as the FCC's finding that the broadcast met the "regularly scheduled" requirement was "rational and consistent" with § 315(a), it should be regarded on appeal as "permissible." *NLRB v. United Food and Commercial Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413, 420–21, 98 L.Ed.2d 429 (1987). Based on our review of the record, we find that the Commission's decision meets this standard, notwithstanding the deviations in the Perot telecast from the typical "Nightline" format. Since April 1988, "Nightline" had on thirteen occasions employed the same "town meeting" format used in "Who is Ross Perot?,"[8] occasionally without using "Nightline" in the title, J.A. 153, and occasionally without employing Ted Koppel as host. In addition, "Nightline" had on many occasions run longer than its scheduled time period. J.A. 155–56. Fulani pointed out during oral argument that the several occasions in which "Nightline" adopted a "town meeting" format, used a host other than Koppel, or ran overtime, constituted only a small fraction of the shows in the series. But for a certain format to qualify as "regularly scheduled," there is no rigid requirement that it run on a daily or weekly basis; for example, the FCC has held that quarterly programs may qualify as "regularly scheduled" news interviews. *See Storer Broadcasting Co.,* 58 F.C.C.2d 982, 983 (1976) ("Although a majority of the programs which fall within [the news interview] exemption are scheduled on a daily or weekly basis, we can infer no Congressional intent that this requirement be so strictly interpreted so as to exclude programs sched-

---

7. To the extent that the legislative history does elucidate the intent behind the "regularly scheduled" requirement, it expresses a concern only about programs which are candidate-initiated, and broadcast "only at such times and with such frequency as the candidate may specify." *See Aspen Institute,* 55 F.C.C.2d at 709. Nothing in the record suggests that Ross Perot initiated the ABC telecast, much less dictated the times and frequency of the event.

8. As the FCC opinion notes, the FCC previously has determined that the "town meeting" format does fall under the news interview exemption category. *See Fulani,* 9 F.C.C.R. at 2259 & n. 11 (citing *Multimedia Entertainment, Inc.,* 56 RR 2d 143 (1984)).

uled on a quarterly basis."). Finally, although there is no precedent on "Nightline" for combining the "town meeting" format with a candidate's appearance, it is undisputed that political issues and political candidates are a staple of the "Nightline" series. Thus, in short, we find that the FCC's finding that ABC's Perot telecast met the "regularly scheduled" requirement was "based on a permissible construction of" § 315. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

Fulani urges that we frame the "precise question at issue," *Id.* at 842, 104 S.Ct. at 2781, as whether Congress intended "regularly scheduled" programs to exclude special, one-time news programs. Pet'r Br. at 21–23. If we were to construe the "precise question" as such, then we would be bound to conclude that there is a clearly discernible congressional intent with respect to the issue: by suggesting the "regularly scheduled" requirement in the legislative history to the § 315(a)(2) exemption, Congress clearly intended to foreclose special, one-time news programs from the exemption. *See King Broadcasting Co. v. FCC,* 860 F.2d 465, 469 (D.C.Cir.1988). Hence, if we were to accept Fulani's framing of the issue, we would not reach the second part of the *Chevron* framework.

Nonetheless, the line of inquiry advocated by Fulani begs the question of whether the Perot telecast was actually a one-time news program—or whether it was, in fact, a regularly-scheduled edition of the "Nightline" series. The FCC's conclusion that "Who is Ross Perot?" and "Nightline" were one and the same resolved a question based on historical facts which are not in dispute. Inasmuch as an evidentiary hearing was neither required nor held,[9] we review the FCC's factual inference for whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *ITT World Communications v. FCC,* 595 F.2d 897, 901 (2d Cir.1979) (quoting 5 U.S.C. § 706(2)(A)). Upon a full review of the record, we find that the FCC did not abuse its discretion in concluding that "Who is Ross Perot?" was consonant with programs—in particular, those employing the "town meet-

ing" format—previously aired on the "Nightline" series. *See Fulani,* 9 F.C.C.R. at 2259. Although ABC never identified "Who is Ross Perot?" as part of the "Nightline" series during the course of the broadcast, we do not believe that this defeats the exemption. Fulani's counsel acknowledged at oral argument that had ABC simply flashed the "Nightline" moniker in its opening credits, the issue would be different (although he stopped short of conceding that such a move by ABC would have dispositively validated the premise that "Who is Ross Perot?" was part of the "Nightline" series). In our view, it is excessively formalistic to construe the "bona fide news interview" exemption as turning on networks' identification choices, when the formats between the broadcast at issue and the series of which the broadcast is said to be a part are similar. Further, it seems anomalous to emphasize subtle differences in networks' exercise of their editorial discretion. Thus, if we posed the question as Fulani does, we would nonetheless find support for the agency's conclusion that the program was not a one-time news event.

In sum, we uphold the FCC's determination that the Perot telecast met the "regularly scheduled" requirement of the bona fide news interview exemption. This result is not contingent on whether we accept, for purposes of *Chevron,* the FCC's or Fulani's framing of the "precise question at issue." 467 U.S. at 842, 104 S.Ct. at 2781. As we have sought to demonstrate, each version of the issue would send us down a different path, but we would arrive at the same destination.

### 2. *"Control"*

■ The second component of the § 315(a)(2) inquiry is whether the broadcaster exercises "sufficient control over the content and format of the program." *U.S. News,* 2 F.C.C.R. at 7102. The Commission found that Jennings—and not Perot—was in control of the program. *Fulani,* 9 F.C.C.R. at 2259–60. Fulani argues that the FCC abused its discretion in so holding.

**9.** *See* Part III, *infra.*

The issue of sufficiency of journalistic control is a mixed question of law and fact; thus, we bring the "reasonable basis" standard to bear on the FCC's decision that ABC did exercise control. *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 130–31, 64 S.Ct. 851, 860–61, 88 L.Ed. 1170 (1944); *cf. Hanly v. Kleindienst*, 471 F.2d 823, 829 (2d Cir.1972), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) (stating that agency rulings on mixed questions are reviewed for a reasonable basis, unless the contested meaning of a statutory term can be isolated as a question of law). This standard of scrutiny prescribes "deference" by this court to the agency's judgment. *See JSP Agency, Inc. v. American Sugar Refining Co.*, 752 F.2d 56, 60 n. 7 (2d Cir.1985). Viewing the FCC's decision through the lens of this standard of review, we find that there was a reasonable basis for the FCC's finding that Jennings, and not Perot, was in control of the proceedings.

First, Fulani claims that Jennings "turned the microphone over to Perot" at the outset of the live segment of the broadcast, Pet'r Br. at 5, and she underscores Jennings's telling Perot, "[B]e my guest." [10] Pet'r Br. 33, 37. From our reading of the transcript, however, we conclude that this episode was a limited opportunity for Perot to respond to the documentary on his career that ABC had just aired, not a transfer of control. Transcript at 1. Perot was not given carte blanche to give a campaign speech; characteristic of the typical news interview, Perot's remarks were frequently interrupted by Jennings's questions or elicitations of clarification. *See id.* Nor are we persuaded by

Fulani's argument that Jennings's questioning was too passive to establish control on the part of the network, or that an episode during the telecast—in which Jennings apologized for interrupting Perot's response and allowed Perot to continue speaking about the documentary segment [11]—was probative of a shift of control by ABC to Perot.

Second, although most audience members who asked questions were preselected by ABC and called upon by Jennings, Fulani points out that one audience member shouted out a question in an angry outburst,[12] which Jennings permitted Perot to answer. Transcript at 5. We disagree with Fulani's argument, however, that this impromptu question pointed to a general abdication of control by ABC. Perot's lack of advance knowledge of the content of the audience questions belies any inference that he was in control of the evening's agenda. To the extent that the impromptu question amounted to a fleeting surrender of control by ABC, the control did not shift to Perot, as the hostile tone and content of the question make clear.

Thus, we find Fulani's arguments inadequate to rebut the proposition that there was a "reasonable basis" for the FCC's decision that ABC exercised journalistic control sufficient to meet the second requirement of the § 315(a)(2) "bona fide news interview" exemption.

### 3. "Reasonable, Good Faith Journalistic Judgment"

■ The third requirement of the § 315(a)(2) exemption is that the broadcaster's decisions regarding "format, content and

---

**10.** Jennings's full statement was as follows: "[B]efore our hour this evening, you did say that you might want to take a minute or so at the beginning of this program to respond to the hour we did on you in prime time, so be my guest." Transcript at 1.

**11.** This exchange occurred during the part of Perot's response in which he described his efforts to raise consciousness about possible prisoners-of-war in Laos, Cambodia and Vietnam. Jennings interjected, asking whether Perot would send out search teams if he were elected president.

PEROT: I'm not finished talking about your program. Could I finish?
JENNINGS: Yes, sir.

PEROT: Then I'll be glad to answer your question.
JENNINGS: My apologies.
PEROT: No problem.
Transcript at 1–2.

**12.** The audience member launched into a tirade against Perot for Perot's alleged discrimination against homosexuals, telling Perot, "[Y]ou're a bigot for what you said so far about gays and lesbians, and America better watch out, because this week it's gays and lesbians you attack, next week you go after the next group that's suffering. You're a bully, Mr. Perot, nothing but a pint-sized bully." Transcript at 5.

participants are based on his reasonable, good faith journalistic judgment rather than on an intention to advance the candidacy of a particular person." *Political Primer,* 100 F.C.C.2d at 1496; *see also U.S. News,* 2 F.C.C.R. at 7102; *Radio Station KDAC,* 87 F.C.C.2d 429, 430 (1980). "[A]bsent evidence of broadcaster intent to advance a particular candidacy, the judgment of the newsworthiness of an event is left to the reasonable news judgment of professionals." *Chisholm,* 538 F.2d at 359. In this exercise of news judgment, broadcasters enjoy "reasonable latitude." *Kennedy for President Comm. v. FCC,* 636 F.2d 417, 425 (D.C.Cir.1980) (quoting 105 CONG.REC. 17,782 (1959) (statement of Rep. Oren Harris)).

█ We find that there was a "reasonable basis," *Hearst Publications,* 322 U.S. at 130–31, 64 S.Ct. at 860–61, for the FCC's finding that ABC's decisions were not motivated by an intention to advance Perot's candidacy. *See Fulani,* 9 F.C.C.R. at 2258. Our review of the transcript leads us to believe that the tenor of the proceedings was as critical as it was flattering,[13] generally evidencing no undue favoritism by ABC toward Perot. Audience members asked Perot probing questions—questions that had been prescreened and preselected by ABC—in a manner wholly consistent with the typical news interview. Jennings repeatedly pressed Perot for specifics during the question-and-answer segment of the broadcast. Taken together, these facts provide an ample basis for the conclusion that the network did not intend to advance Perot's candidacy.

Fulani further suggests that ABC's pursuit of competitive advantage compromised its news judgment. *Mass Media Ruling,* 7 F.C.C.R. at 6882; Pet'r Br. at 45. We disagree. ABC's decision to devote an episode of "Nightline" to Perot was clearly driven by

a sense that the unprecedented appeal of Perot's nascent candidacy was newsworthy,[14] and that the public interest in a feature on Perot—as measured by network ratings[15]—would be overwhelming. Absent a showing of bad faith, however, it does not follow from this premise that ABC affirmatively sought to promote Perot's candidacy. It would be unrealistic to expect networks to make decisions about news coverage—political events or otherwise—without casting an eye toward ratings. Concern for high ratings and "good faith journalistic judgment" are not mutually exclusive. The balance between these two objectives is a "delicate area" and one in which neither a court nor an agency should—absent proof that the network has falsified, distorted or suppressed news—impose its judgment regarding "what news is of prime interest to its listening audience and the manner in which it should be presented." *American Broadcasting Co. Inc. (KGO–TV),* 56 F.C.C.2d 275, 276 (1975) (rejecting claim that San Francisco television station's license should not be renewed because of its allegedly excessive focus on audience ratings).

**D**

In sum, we defer to the FCC's rational and reasonable finding that ABC's "Who is Ross Perot?" telecast met the requirements for a "bona fide news interview" exemption under § 315(a)(2). As a general matter, we find that the FCC's decision was fully consistent with the policies underlying the equal time requirement and the exemptions thereto. Congress added the exemptions to the equal time provision in order to avoid "deterr[ing] the broadcast media from providing the public with full coverage of political news events," *Branch,* 824 F.2d at 44 (D.C.Cir. 1987), *cert. denied,* 485 U.S. 959, 108 S.Ct.

---

**13.** According to some news reports, after "Who is Ross Perot?" aired, some Perot supporters complained that ABC had "stacked" its studio audience against Perot and was out to "get" the candidate. David Zurawick, *Is the Free Ride Over?,* BALTIMORE SUN, July 2, 1992, J.A. 160–61. This reaction supports the FCC's conclusion that ABC did not display favoritism toward Perot in the course of the broadcast.

**14.** A search in the LEXIS database of news publications reveals that 954 stories with Perot's name in the headline were published in the two weeks prior to Perot's June 29, 1992 appearance on ABC. Search of LEXIS, News library, Allnws file (Feb. 4, 1995).

**15.** *See* Peter Johnson et al., *No Tomorrow at 'Today' for Utley and Williams,* USA TODAY, June 22, 1992, at 3D ("[H]aving Ross Perot on your show can do wonders for your ratings.").

1220, 99 L.Ed.2d 421 (1988), without licensing "favoritism or bias" toward particular candidates. *King Broadcasting Co.*, 860 F.2d at 467. Our review of the record reveals no evidence of favoritism. Hence, the FCC's finding comports with the manifest purposes of the equal time requirement and constituted an appropriate exercise of the Commission's discretion, Fulani's arguments to the contrary notwithstanding.

### III

The next, and final, issue before us is whether the FCC erred in refusing to conduct an evidentiary hearing in connection with Fulani's complaint. The FCC's explanation for its decision was that Fulani failed to "establish[ ] that a substantial and material question of fact is in dispute." *Fulani,* 9 F.C.C.R. at 2260.

Section 315 does not require that the FCC conduct hearings, nor does that statute prescribe any other formal procedures. *See Lowest Unit Charge Requirements of Section 315(b),* 7 F.C.C.R. 4123, 4127 (1992). Rather, the FCC "has broad authority to establish individually tailored procedures to carry out its responsibilities under the [Communications] Act, including the enforcement of Section 315." *Id. Accord ITT World Communications, Inc. v. FCC,* 595 F.2d 897, 901 (2d Cir.1979) (holding that in the absence of a statutory requirement in § 214(a) of the Communications Act the FCC has broad discretion to decide whether to hold hearings under that section).

Fulani's primary arguments in support of compelling a hearing rest on assertions of factual incongruities. She argues that the FCC made "extreme extrapolations from ambiguous statements in a dry transcript." Reply Br. at 14. For example, she calls attention to the FCC's statement that Jennings "not[ed] that ABC had preselected both the audience members and the questions they intended to ask Perot," *id., quoting* Resp't Br. at 6, and argues that this statement contradicts Jennings's assertion that he did not know the content of the questions. Reply Br. at 14, *quoting* Transcript at 1.

Upon an examination of the record, we conclude that Fulani is incorrect, and we find that there was ample basis for the FCC's statements concerning preselection of audience members and of questions. First, Jennings said that the audience members were present "at [ABC's] invitation," and that they "come with questions which they have told our producers they want to ask." Transcript at 1. These statements clearly conveyed, if not explicitly, that preselection had taken place. Second, Jennings's statement that he *himself* did not know what the questions were, does not foreclose the proposition that the ABC producers had advance knowledge of the questions' content.

In sum, we hold that the FCC had a sufficient factual record to make its determinations regarding whether "Who is Ross Perot?" met the requirements for a § 315(a)(2) exemption. The Commission's refusal to conduct an evidentiary hearing was squarely within its scope of discretion and a proper exercise of that discretion; we thus decline Fulani's invitation to disturb that decision.

### IV

By way of summary:

1. We uphold the FCC's determination that ABC's "Who is Ross Perot?" did not trigger the equal time requirement of § 315(a). The Commission acted reasonably and fully in accord with the statute's purpose in finding that the Perot telecast met each of the agency's three requirements of the "bona fide news interview" exemption to the equal time provision. Fulani fails to convince us that the Commission acted in an arbitrary or capricious manner in any regard.

2. We uphold the FCC's conclusion that Fulani was not entitled to an evidentiary hearing in connection with her equal time claim.

Because we affirm the FCC's decision in all respects, we need not reach the issue of determining an appropriate remedy. Fulani had requested that we order post-election injunctive relief granting her "compensatory time" on ABC—presumably "Who is Lenora B. Fulani?" or the like—even though the

1992 presidential election is nearly 2½—years behind us. We note that even if we had found in favor of Fulani, we would look askance at the timing of her filings in considering her entitlement to equitable relief: ABC rejected her equal time request on July 9, 1992; however, Fulani did not file her FCC complaint until September 11—more than two months later, and less than eight weeks before the presidential election.

Nonetheless, in view of the time required for full judicial review and the time-sensitive nature of political campaigns, we are mindful of the potential for candidates' equal opportunity rights to be abrogated through the passage of time. To the extent a candidate has a valid equal time claim and pursues it in a timely fashion, the right must somehow be vindicated. We reserve a fuller explication of that puzzle, however, for another day.

The petition for review is denied.